IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WHISPERING PINES MOBILE
HOMEOWNERS' ASSOCIATION,
INC., OF KISSIMMEE, on behalf of
the homeowner-members in its
representative capacity and on behalf
of themselves and all others similarly
situated,

       CASE NO.

       Plaintiffs,

       **CLASS ACTION REPRESENTATION
AND DEMAND FOR JURY TRIAL
INJUNCTIVE RELIEF SOUGHT**

Vs.

KURT WALLACH,
REGINA WATTLES,
MARILYN WALLACH,
MARK WALLACH,
JOHN MUSCHAWECK,
KURTELL GROWTH INDUSTRIES, LTD.,
SUNNY LAKES CAPITAL, LLC,
KURTELL MANAGEMENT COMPANY, LLC,
KURTELL HOLDINGS, LLC,
KURTELL SALES, LLC,
KURTELL REALTY, LLC, AND
KURMAR CAPITAL, LLC.

       Defendants.

_____/

**COMPLAINT**

Table of Contents

| Section | | | Pg. |
|---|---|---|---|
| 1.0 | Introduction | | 9 |
| | **The Defendants act and conspire to circumvent statutory regulations to defraud and exploit elderly mobile home owners** | | 9 |
| 2.0 | Jurisdiction and Venue | | 10 |
| 3.0 | **Statutory background:** | | 11 |
| | 3.1 | The Florida Legislature recognizes mobile home owners' "unique hybrid tenancy" and need for regulation to protect their significant basic property and other rights, including their bargaining position | 11 |
| | 3.2 | The United States Supreme Court and California Federal District Court recognize the need to equalize the economic leverage mobile home park owners hold over mobile home owners | 12 |
| | 3.3 | Florida Courts also recognize the need to equalize the economic leverage mobile home park owners hold over mobile home owners | 13 |
| | 3.4 | The Florida Mobile Home Act provides broad protections for mobile home owners | 15 |
| | 3.5 | The Florida Mobile Home Act provides significant obligations, duties and restrictions upon park owners | 16 |
| | 3.6 | The park owner may not collect a charge which results in payment of money previously collected as part of lot rental | 17 |
| | 3.7 | The park owner may not terminate a mobile home owner's continuous tenancy or evict but for very limited grounds | 18 |
| | 3.8 | The park owner must deliver to the home owner an administratively approved prospectus prior to entering into an enforceable lot rental agreement | 19 |

| | 3.9 | The park owner must provide a 90 day advance written notice before increase in lot rental amount, reduction in services or utilities, or change in rules and regulations | 20 |
|---|---|---|---|
| | 3.10 | The park owner may not interfere with the assumption of the resale seller's existing prospectus by the resale home purchaser | 22 |
| | 3.11 | The Court has broad discretion to fashion relief for mobile home owners | 23 |
| 4.0 | Parties | | 24 |
| | 4.1 | Plaintiffs: Whispering Pines Mobile Homeowners' Association, Inc., of Kissimmee | 24 |
| | 4.2 | Defendants | 25 |
| | | 4.2.1   Kurt Wallach | 25 |
| | | 4.2.2   Regina Wattles | 27 |
| | | 4.2.3   Marilyn Wallach | 27 |
| | | 4.2.4   Mark Wallach | 28 |
| | | 4.2.5   John Muschaweck | 29 |
| | | 4.2.6   Kurtell Growth Industries, Ltd. | 30 |
| | | 4.2.7   Sunny Lakes Capital, LLC | 31 |
| | | 4.2.8   Kurtell Management Company, LLC | 31 |
| | | 4.2.9   Kurtell Holdings, LLC | 32 |
| | | 4.2.10  Kurtell Sales, LLC | 33 |
| | | 4.2.11  Kurtell Realty, LLC | 33 |
| | | 4.2.12  Kurmar Capital, LLC | 34 |
| 5.0 | Class Representation Allegations | | 35 |

6.0   **The Scheme:**                                                                39

**Since 2016, the Defendants threatened, terrorized, and marginalized
over 400 elderly mobile home owners and their representative
incorporated homeowners' association, the Whispering Pines HOA,
to support Defendants' fraudulent and deceptive scheme to increase
lot rental and associated fees without regard for the homeowners'
statutory rights under the Florida Mobile Home Act**                                  39

6.1   Defendants unreasonably eliminated or reduced services and
      Park facilities without 90 day notice or corresponding reduction
      in lot rent                                                                     41

      6.1.1   Pool, Hot-tub/spa                                                       41

      6.1.2   Security                                                                42

      6.1.3   Clubhouse                                                               42

      6.1.4   Common Areas - Facilities, lighting, landscaping, etc.                  44

      6.1.5   Common Areas - Streets                                                  44

      6.1.6   "55 and Older" Park                                                     45

6.2   Setting the stage for the Scheme:                                              45

      In 2015 the Defendants tried to evict an elderly homeowner
      and Whispering Pines HOA Board member in retaliation for
      his complaints that the Defendants violated the Florida Mobile
      Home Act                                                                        45

6.3   In 2016 phone conversation with Whispering Pines HOA
      President and Director Brian Norton to schedule a statutorily
      required meeting at a "mutually convenient" meeting place, an
      irate and abusive Defendant Kurt Wallach yelled that:
      "You can just get your ass down here to Vero!"                                  49

6.4   At a 2016 meeting in the Park clubhouse with the Whispering
      Pines HOA, Defendant Kurt Wallach battered his wife,
      Defendant Marilyn Wallach in the presence of the Plaintiffs. An
      angered Kurt Wallach then stood over a board member of the
      Whispering Pines HOA and yelled that: "If some of you don't
      like it [the conditions in the Park] you can just move."                        50

6.5     Since 2016 at initial statutory and mediation meetings with the Whispering Pines HOA, the Defendants fraudulently rejected the Whispering Pines HOA's other suggested mobile home park lot rental comparables as not being in the same "breed" of double-wide Parks like Whispering Pines ............... 50

6.6     Since 2016 the Defendants have acted and conspired to discourage participation and cooperation by the elderly homeowners with the Whispering Pines HOA by, *inter alia*, requiring that all Park events or activities be organized through the Defendants ............... 51

6.7     Since 2016 the Defendants have illegally and arbitrarily negatively impacted the resale value of the homes in the Park ............... 52

6.8     In 2019 the Defendants illegally denied the occupancy of a caregiver-daughter of an elderly homeowner and former board member of Whispering Pines HOA in retaliation for his complaints that the7 Defendants violated the Florida Mobile Home Act. The Defendants also threatened to evict the elderly homeowner and his spouse which the homeowner: "... cannot win and will result in a large attorney's fee award" for Kurt Wallach and the removal of their family from the Park ............... 52

6.9     Mail and Wire Fraud ............... 56

6.10    Extortion ............... 58

7.0   Claims ............... 59

7.1     **Count One – RICO** ............... 59

7.1.1   Kurt Wallach-Wattles-Muschaweck-Marilyn Wallach-Mark Wallach Enterprise ............... 59

7.1.2   Alternative 1: Kurtell Management Enterprise ............... 60

7.1.3   Alternative 2: Whispering Pines Mobile Home Park Enterprise ............... 61

7.1.4   Alternative 3: Mark Wallach Enterprise ............... 62

7.1.5   Alternative 4: Kurtell Realty Enterprise ............... 63

7.2     **Count Two – RICO**                                                65

         7.2.1   Corporate Enterprise                                       65

         7.2.2   Alternative 1: Kurtell Management Enterprise               66

         7.2.3   Alternative 2: Whispering Pines Mobile Home
                 Park Enterprise                                            67

         7.2.4   Alternative 3: Mark Wallach Enterprise                     68

         7.2.5   Alternative 4: Kurtell Realty Enterprise                   69

   7.3     **Count Three – RICO**                                          71

   7.4     **Count Four – RICO Conspiracy**                                73

         7.4.1   Sunny Lakes Capital, Kurtell Holdings, Kurtell Realty
                 and/or Kurmar Capital conspired with Kurt Wallach,
                 Wattles, Muschaweck, and/or Marilyn Wallach               73

         7.4.2   Kurtell Growth Industries and Kurmar Capital conspired
                 with Mark Wallach, Wattles, and/or Marilyn Wallach        73

         7.4.3   Kurtell Sales conspired with Kurt Wallach, Wattles,
                 Muschaweck, and/or Mark Wallach                           74

         7.4.4   Sunny Lakes Capital and Kurtell Holdings conspired
                 with Mark Wallach                                         74

   7.5     **Count Five – Unjust Enrichment**                             76

   7.6     **Count Six – Florida Deceptive and Unfair Trade
           Practices Act ("FDUTPA")**                                     77

   7.7     **Count Seven – Denial of Rights of Access under Americans
           with Disabilities Act ("ADA")**                               80

         7.7.1   Site Entrance Signage                                     82

         7.7.2   Accessible Parking                                        82

         7.7.3   Exterior Accessible Routes                                83

         7.7.4   Accessible Doors                                          83

         7.7.5   Restrooms                                                 83

         7.7.6   General                                                   84

|       | 7.7.8 | Failure to Remove Architectural Barriers in an Existing Facility | 85 |
|       | 7.7.8 | Failure to Make an Altered Facility Accessible | 85 |
|       | 7.7.9 | Failure to Modify Existing Policies and Procedures | 86 |

**7.8**  **Count Eight – Florida Mobile Home Act - Breach of statutory duties and lot rental agreement**  86

|       | 7.8.1 | Defendants failed to comply with requirements of applicable building, housing, and health codes | 86 |
|       | 7.8.2 | Defendants failed to maintain utility connections and systems for which the Park Owner is responsible in proper operating condition | 89 |
|       | 7.8.3 | Defendants failed to maintain the common areas in a good state of appearance, safety, and cleanliness | 89 |
|       | 7.8.4 | Defendants failed to maintain buildings and improvements in common areas in a good state of repair and maintenance | 90 |
|       | 7.8.5 | Defendants failed to provide access to the common areas at all reasonable  times for the benefit of the Park residents and their guests | 90 |
|       | 7.8.6 | Defendants failed to comply with properly promulgated Park rules and regulations | 91 |
|       | 7.8.7 | Defendants unreasonably disturb or breach the peace of the Park residents | 92 |
|       | 7.8.8 | Defendants failed to comply with their statutory obligations of good faith and fair dealings | 92 |

**7.9**  **Count Nine – National Origin and Race Discrimination in Violation of the Fair Housing Act**  94

**7.10**  **Count Ten – Disability Discrimination in Violation of the Fair Housing Act**  96

**7.11**  **Count Eleven – Disability Discrimination in Violation of the Fair Housing Act**  97

**7.12**  **Count Twelve – Violation of the Fair Credit Reporting Act**  98

| | **7.13** | **Count Thirteen – Violation of the Fair Credit Reporting Act** | 99 |
|---|---|---|---|
| | **7.14** | **Count Fourteen – Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")** | 100 |
| | **7.15** | **Count Fifteen – Malicious Prosecution** | 103 |
| | **7.16** | **Count Sixteen – Abuse of Process** | 104 |
| | **7.17** | **Count Seventeen – Civil Conspiracy** | 104 |
| 8.0 | | Demand for Jury Trial | 105 |
| 9.0 | | Relief Requested | 105 |
| | 9.1 | Damages and prejudgment interest | 105 |
| | 9.2 | Escrow lot rental amount | 106 |
| | 9.3 | Declaratory judgment | 106 |
| | 9.4 | Refund and reduction of lot rental amount | 106 |
| | 9.5 | Injunctive relief | 107 |
| | 9.6 | An Order finding noncompliance with obligations of good faith and fair dealing | 108 |
| | 9.7 | Reasonable attorneys' fees and costs | 108 |
| | 9.8 | Supplemental equitable and legal relief | 108 |

Plaintiff, Whispering Pines Mobile Homeowners' Association, Inc., of Kissimmee, on behalf of the homeowner-members in its representative capacity and on behalf of themselves and all others similarly situated, by and through the undersigned counsel, brings this lawsuit against Defendants Kurt Wallach, an individual, Regina Wattles, an individual, Marilyn Wallach, an individual, Mark Wallach, an individual, John Muschaweck, an individual, Kurtell Growth Industries, Ltd., a Foreign (Texas) limited partnership, Sunny Lakes Capital, LLC, a Florida limited liability company, Kurtell Management, LLC, a Florida limited liability company, Kurtell Holdings, LLC, a Florida limited liability company, Kurtell Sales, LLC, a Florida limited liability company, and Kurtell Realty, LLC, a Florida limited liability company, and Kurmar Capital, LLC, a Florida limited liability company, collectively referred to herein as "Defendants," and alleges:

## 1.0    Introduction:

### The Defendants act and conspire to circumvent statutory regulations to defraud and exploit elderly mobile home owners

1.      This is a class action of over 400 elderly current and past mobile homeowners who own or owned a mobile home and lease or leased the lot underneath their home at the Whispering Pines Mobile Home Park ("Park") located in the City of Kissimmee, Osceola County, Florida, pursuant to the Florida Mobile Home Act, Chapter 723, *Fla. Stat.*, and is brought under the federal Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961, *et seq.*, and various other federal and state common law doctrines or statutes. This action arises out of Defendants' fraudulent and conspiratorial acts to illegally and unreasonably threaten, terrorize, and marginalize over 400 elderly current and past mobile home owners and their representative incorporated homeowners' association, the Whispering Pines HOA, to support Defendants' fraudulent and deceptive scheme to increase lot rental and associated fees

without regard for the homeowners' statutory rights under the Florida Mobile Home Act.

2.      The Plaintiff homeowners are "elderly persons" as defined by §825.101(4), *Fla. Stat.*, as persons "... 60 years of age or older who is suffering from the infirmities of aging as manifested by advanced age or organic brain damage, or other physical, mental, or emotional dysfunctioning, to the extent that the ability of the person to provide adequately for the person's own care or protection is impaired."

3.      Plaintiffs request a declaratory judgment that Defendants' conduct violates various Federal and Florida laws, and seeks an award of treble damages, actual, statutory, and to the extent permitted, punitive damages, attorneys fees and costs for themselves and each member of the Class.

## 2.0    Jurisdiction and Venue

4.      This action is brought under the federal Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961, *et seq.*, and various other state common law doctrines or statutes. Jurisdiction is vested in this Court by virtue of 28 U.S.C. § 1331. Plaintiffs' claims brought under state law are so related to Plaintiffs' federal claims, over which the Court has original jurisdiction, that they form part of the same case or controversy. Under Article III of the United States Constitution, the Court has supplemental jurisdiction over Plaintiffs' related state common law and statutory claims pursuant to 28 U.S.C. § 1367. The Plaintiffs seek damages and declaratory relief pursuant to 28 U.S.C. § 2201.

5.      In the alternative, the ends of justice require that the Court exercise personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965(b) in that the Court has personal jurisdiction over at least one defendant, (2) the defendants engaged in a multi-district conspiracy, and (3) there is no other district in which a Court would have personal jurisdiction over all of the Defendants.

6.      A substantial part of the events and omissions giving rise to the claims stated herein occurred in this District and a substantial part of the property that is the subject of this action is situated in this District. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2) and pursuant to 18 U.S.C. § 1965(b).

## 3.0    Statutory background:

### 3.1    The Florida Legislature recognizes mobile homeowners' "unique hybrid tenancy" and need for regulation to protect their significant basic property and other rights, including their bargaining position

7.      Florida mobile homeowners typically rent the lot underneath their home from the mobile home park owner pursuant to a long term lease. In 1992 the Florida Legislature recognized this unique hybrid tenancy and the mobile homeowners' need for regulation to protect their significant basic property and other rights, including their bargaining position once occupancy has commenced:

> ***
>
> The Legislature finds that there are factors unique to the relationship between a mobile home owner and a mobile home park owner. **Once occupancy has commenced, unique factors can affect the bargaining position of the parties and can affect the operation of market forces.** Because of those unique factors, there exist inherently real and substantial differences in the relationship which distinguish it from other landlord-tenant relationships. The Legislature recognizes that mobile home owners have basic property and other rights which must be protected. The Legislature further recognizes that the mobile home park owner has a legitimate business interest in the operation of the mobile home park as part of the housing market and has basic property and other rights which must be protected. This chapter is created for the purpose of regulating the factors unique to the relationship between mobile home owners and mobile home park owners in the circumstances described herein. It recognizes that **when such inequalities exist between mobile home owners and mobile home park owners as a result of such unique factors, regulation to protect those parties to the extent that they are affected by the inequalities, while preserving and protecting the rights of both parties, is required.**
>
> ***

§ 723.004(1)(Emphasis added), 1992 Fla. Sess. Law Serv. Ch. 92-148 (C.S.H.B. 217

**3.2    The United States Supreme Court and California Federal District Court recognize the need to equalize the economic leverage mobile home park owners hold over mobile home owners**

8.      In the 1992 United States Supreme Court decision in *Yee v. City of Escondido, Cal.,* Justice O'Connor similarly observed the unique or hybrid nature of a mobile home tenancy and that once occupancy has commenced that "... it is necessary that the owners of mobilehomes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the provisions of this chapter [California's similar Mobilehome Residency Law, Cal.Civ.Code Ann. § 798 et seq.]...":

> The term 'mobile home' is somewhat misleading. Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself. They are generally placed permanently in parks; once in place, only about 1 in every 100 mobile homes is ever moved. Hirsch & Hirsch, *Legal–Economic Analysis of Rent Controls in a Mobile Home Context: Placement Values and Vacancy Decontrol*, 35 UCLA L. Rev. 399, 405 (1988). A mobile home owner typically rents a plot of land, called a "pad," from the owner of a mobile home park. The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. The mobile home owner often invests in site-specific improvements such as a driveway, steps, walkways, porches, or landscaping. When the mobile home owner wishes to move, the mobile home is usually sold in place, and the purchaser continues to rent the pad on which the mobile home is located.

> In 1978, California enacted its Mobilehome Residency Law, Cal.Civ. Code Ann. § 798 et seq. (West 1982 and Supp.1991). The legislature found "that, because of the high cost of moving mobilehomes, the potential for damage resulting therefrom, the requirements relating to the installation of mobilehomes, and the cost of landscaping or lot preparation, **it is necessary that the owners of mobilehomes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the provisions of this chapter."** § 798.55(a).

*Yee v. City of Escondido, Cal.*, 503 U.S. 519, 522 (1992)(Emphasis added)

9.      And in the 2010 decision of *Guggenheim v. City of Goleta,* the United States District Court for the Central District of California construed the same California remedial mobile home statute and observed that: " ... Mobile homes have the peculiar characteristic of separating ownership of homes that are, as a practical matter, affixed to the land, from the land itself. Because the owner of the mobile home cannot readily move it to get a lower rent, the **owner of the land has the owner of the mobile home over a barrel**....." 638 F.3d 1111 (9th Cir. 2010)[footnotes omitted][Emphasis Added]

**3.3    Florida Courts also recognize the need to equalize the economic leverage mobile home park owners hold over mobile home owners**

10.      In the 1992 decision in *Herrick v. Florida Dept. of Business Regulation, Div. of Florida Land Sales, Condominiums and Mobile Homes,* the First District Court of Appeal reaffirmed that the Florida Mobile Home Act is a remedial statute enacted to protect mobile homeowners. 595 So.2d 148 (Fla. 1st DCA 1992):

                                        ***

> **... [T]he purpose for enacting The Florida Mobile Home Act was to protect mobile homeowners, by equalizing the economic leverage mobile home park owners hold over the tenants.** 1 J. Hauser, *Florida Residential Landlord–Tenant Manual,* Chapter 8 (Supp.1991). In *Stewart v. Green*, 300 So.2d 889 (Fla.1974) and *Palm Beach Mobile Homes, Inc. v. Strong*, 300 So.2d 881 (Fla.1974), the supreme court observed that the legislature had finally recognized "that a hybrid type of property relationship exists between the mobile home owner and the park owner and that the relationship is not simply one of landowner and tenant." *Stewart*, 300 So.2d at 892. Mobile home tenancy usually involves persons who own their residences which are of considerable size, and once set up in a park, the residences are not mobile in the real sense of the word. "**Because of the difficulties inherent in moving the home from one settled location to another, ... it is hard to imagine a situation where the park owner and the tenants are in an equal bargaining position on rent increases.**" *Belcher v. Kier*, 558 So.2d 1039, 1042 (Fla. 2d DCA), *review denied,* 570 So.2d 1305 (Fla.1990). *See also Harris v. Martin Regency, Ltd.,* 576 So.2d 1294, 1297 (Fla.1991); *Lanca Homeowners, Inc. v. Lantana Cascade of Palm*

*Beach, Ltd.,* 541 So.2d 1121, 1124 (Fla.), *cert. denied,* 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989); *B.J. Pearce v. Doral Mobile Home Villas, Inc.*, 521 So.2d 282 (Fla. 2d DCA 1988). The current costs of moving a mobile home range from $4,000 to $10,000. *See* 1 J. Hauser, *Landlord–Tenant Manual,* at 69.

The **delivery of a prospectus** to all residents of a mobile home park containing twenty-six or more lots, is **one factor in the legislative effort to afford protection to occupants and prospective occupants** of a park. The prospectus is a disclosure document. Villa*g Park Mobile Home Assoc. v. State, Dept. of Business Regulation, Div. of Florida Land Sales, Condominiums and Mobile Homes,* 506 So.2d 426, 428 (Fla. 1st DCA), *review denied*, 513 So.2d 1063 (Fla.1987). It is drafted by the park owner, and must contain information as specified by section 723.012, *Florida Statutes,* including a description of the manner in which utilities and other services are to be provided, an explanation of the manner in which lot rentals will be increased, a provision for ninety days advance notice of any increase or reduction in service, and disclosure of any rate increase or pass through charges to which the homeowner could be subjected. *Village Park v. Dept. of Business Regulation,* 506 So.2d at 428. That is, the prospectus delineates the basis for, and the procedure governing, future rent increases. [*Id.,* at 429.] Unless the park owner fully discloses all proposed fees, charges, and assessments, he waives the right to obtain such in the future. *Lemon v. Aspen Emerald Lakes Assoc., Ltd.,* 446 So.2d 177 (Fla. 5th DCA 1984)]

***

*Herrick v. Florida Dept. of Business Regulation, Div. of Florida Land Sales, Condominiums and Mobile Homes,* 595 So.2d 148 (Fla. 1st DCA 1992)(Emphasis added)

### 3.4    The Florida Mobile Home Act provides broad protections for mobile home owners

11.    The homeowner protections of the Florida Mobile Home Act include:

- An express statutory obligation of good faith and fair dealing in the performance or enforcement of every rental agreement or duty;[1]

- "Lot rental agreement" is broadly defined to include "any mutual understanding or lease, whether oral or written;" [2]

- Required statutory provisions are deemed to be a part of the lot rental agreement;[3]

- Lot rental agreement may not contain any rule or regulation prohibited by or inconsistent with the Florida Mobile Home Act;[4]

- Any provision in the lot rental agreement is void and unenforceable to the extent that it attempts to waive or preclude the rights, remedies, or requirements set forth in the Florida Mobile Home Act or arising under law;[5]

- Park rules and regulations and the prospectus are deemed to be incorporated into the lot rental agreement;[6]

- Rental terms shall be for a minimum of one year;[7]

- No rental agreement shall provide for, nor be construed for, the termination of tenancy or the eviction of a mobile home owner on a ground other than one contained in § 723.061.[8]

---

[1]    § 723.021
[2]    § 723.003(10)
[3]    § 723.031(2)
[4]    § 723.031(1)
[5]    § 723.032(2)
[6]    § 723.031(10)
[7]    § 723.031(4)
[8]    §§723.031(9), 723.032(1)

### 3.5 The Florida Mobile Home Act provides significant obligations, duties and restrictions upon park owners

12.     "Park owner" is broadly defined to also include the property operator who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park.[9] The obligations, duties, and restrictions imposed upon both park owner and operator include:

- The park owner must comply with applicable building, housing, and health codes;

- The park owner must maintain buildings and improvements in common areas in a good state of repair and maintenance;[10]

- The park owner must maintain the common areas in a good state of appearance, safety, and cleanliness;[11]

- The park owner must provide access to common areas, including buildings and improvements at all reasonable times for the homeowners and their guests.[12]

- The park owner must maintain utility connections and systems in proper operating condition;[13]

- The park owner must comply with park rules and regulations and require that other persons also comply and conduct themselves in a manner that does not unreasonably disturb the homeowners or constitute a breach of the peace;[14]

- The park owner is expressly prohibited from committing unreasonable acts. "Unreasonable" is defined to mean arbitrary, capricious, or

---

9       §§ 723.003(13), 723.003(16)
10      § 723.022(2)
11      § 723.022(2)
12      § 723.022(3)
13      §723.022(4)
14      § 723.022(5)

inconsistent with the Florida Mobile Home Act;[15]

- The park owner is expressly prohibited from committing discriminatory acts. "Discriminatory" means that a homeowner is being treated differently as to the rent charged, the services rendered, or an action for possession or other civil action being taken by the park owner, without a reasonable basis for the different treatment;[16]

- The park owner may not discriminatorily increase a home owner's lot rent or discriminatorily decrease services to a home owner, or bring or threaten to bring an action for eviction or other civil action primarily because the park owner is retaliating against the home owner. The park owner may not retaliate against the homeowner for: 1) his or her good faith complaints to a governmental agency charged with enforcing regulations in a mobile home park; 2) the homeowner's organization, encouragement, or participation in a homeowner's association; or 3) the homeowner has complained to the park owner for failure to comply with §723.022. [17]

**3.6    The park owner may not collect a charge which results in payment of money previously collected as part of lot rental**

13.    The park owner may not collect a charge which results in payment of money for sums previously collected as part of the lot rental amount:

- Ad valorem property taxes, non-ad valorem assessments, and utility charges may be passed on only if those charges are not otherwise being collected in the remainder of the lot rental amount and they were disclosed prior to tenancy, were being passed on as a matter of custom between the park owner and the mobile home owner, or the passing on

---

15    §§ 723.003(20), 723.033(3), 723.037(5), 723.037(5), 723.037(5), 723.054(2), 723.059(1), 723.025
16    §§ 723.003(1), 723.031(5), 723.058(5), 723.0615
17    § 723.0615

was authorized by law;[18]

- Ad valorem property taxes, non-ad valorem assessments, and utility charges may be passed on only within one year of the date the park owner remits payment of the charge.[19]

### 3.7    The park owner may not terminate a mobile homeowner's continuous tenancy or evict but for very limited grounds

14.    A properly promulgated rule or regulation may not be arbitrarily applied and used as a ground for eviction.[20] Those very limited grounds for termination of tenancy and eviction of a mobile home owner, occupant, or home are:

- nonpayment of lot rental;[21]

- conviction of a crime committed in the Park detrimental to the health, safety, or welfare of other residents of the mobile home park;[22]

- violation of rule or regulation, rental agreement provision, or the Florida Mobile Home Act which is found by any court to have been an act that endangered the life, health, safety, or property of the park residents or employees or the peaceful enjoyment of the mobile home park by its residents;[23]

- a second violation of the same rule or regulation, rental agreement provision, or the Florida Mobile Home Act within 12 months if the park owner has noticed the mobile home owner, tenant, or occupant within 30 days after the first violation, which specified the actions of the mobile home owner, tenant, or occupant that caused the violation and gave the mobile home owner, tenant, or occupant 7 days to correct

---

18      § 723.031(5)(c)
19      § 723.031(5)(c)
20      § 723.061(1)(c)
21      § 723.061(1)(a)
22      § 723.061(1)(b)
23      § 723.061(1)(c)1

the noncompliance;[24]

- a change in use of the land comprising the mobile home park, or the portion thereof from which mobile homes are to be evicted, from mobile home lot rentals to some other use.[25]

**3.8    The park owner must deliver to the homeowner an administratively approved prospectus prior to entering into an enforceable lot rental agreement**

15.    The prospectus or offering circular together with its exhibits is a disclosure document intended to afford protection to mobile homeowners. The purpose of the document is to disclose the representations of the mobile home park owner concerning the operations of the mobile home park.[26] It must detail the Park services, facilities, and all financial obligations of the tenancy:

- Prior to entering into an enforceable rental agreement for a mobile home lot, the park owner shall deliver to the homeowner a prospectus approved by the division together with all of the exhibits. Delivery shall be made prior to execution of the lot rental agreement or at the time of occupancy, whichever occurs first;[27]

- The park owner may request that the homeowner sign a receipt indicating that the homeowner has received a copy of the prospectus, the rules and regulations, and other pertinent documents so long as any such documents are clearly identified in the receipt itself. Such a receipt shall indicate nothing more than that the documents identified herein have been received by the mobile home owner;[28]

- If the park owner fails to deliver the prospectus and exhibits to the prospective lessee prior to the execution of the lot rental agreement

---

24    § 723.061(1)(c)2
25    § 723.061(1)(d)
26    § 723.011(3)
27    §§ 723.011(1)(a) and (2); *see also Rule* 61B-31.001(12), *Fla. Admin. Code*
28    § 723.011(5)

or prior to initial occupancy, the rental agreement is voidable by the lessee until 15 days after the receipt by the lessee of the prospectus and exhibits. Upon written notice of cancellation by the lessee, the lessee will be entitled to a refund from the park owner of any deposit together with relocation costs for the mobile home, or the market value of the home and any paid appurtenances.[29]

### 3.9 The park owner must provide a 90 day advance written notice before increase in lot rental amount, reduction in services or utilities, or change in rules and regulations

16.    The park owner must give written notice to each affected mobile home owner and the board of directors of the homeowners' association at least 90 days before any increase in lot rental amount or reduction in services or utilities provided by the park owner or change in rules and regulations:

- The home owner's right to the 90-day notice may not be waived or precluded by a home owner, or the homeowners' committee, in an agreement with the park owner;[30]

- The park owner may be compelled by the incorporated homeowners' association to meet with the association's statutory negotiating committee to explain the material factors which accompany the decision to increase the lot rental or reduce services, or change utilities;[31]

- At the meeting, the park owner shall in good faith disclose and explain all material factors resulting in the decision to increase the lot rental amount, reduce services or utilities, or change rules and regulations, including how those factors justify the specific change proposed.

---

29    § 723.014
30    § 723.037(1)
31    § 723.037(4)(b)1

The park owner may not limit the discussion of the reasons for the change to generalities only, such as, but not limited to, increases in operational costs, changes in economic conditions, or rents charged by comparable mobile home parks. For example, if the reason for an increase in lot rental amount is an increase in operational costs, the park owner must disclose the item or items which have increased, the amount of the increase, any similar item or items which have decreased, and the amount of the decrease. If an increase is based upon the lot rental amount charged by comparable mobile home parks, the park owner shall disclose, and provide in writing to the committee at or before the meeting, the name, address, lot rental amount, and any other relevant factors relied upon by the park owner, such as facilities, services, and amenities, concerning the comparable mobile home parks. The information concerning comparable mobile home parks to be exchanged by the parties is to encourage a dialogue concerning the reasons used by the park owner for the increase in lot rental amount and to encourage the home owners to evaluate and discuss the reasons for those changes with the park owner. The park owner shall prepare a written summary of the material factors and retain a copy for 3 years. The park owner shall provide the committee a copy of the summary at or before the meeting;[32]

- "Market rent" is defined to mean that rent which would result from market forces absent an unequal bargaining position between mobile home park owners and mobile home owners;[33]

- In determining market rent, the court may consider rents charged

---

32    § 723.037(4)(b)
33    § 723.033(4)

by comparable mobile home parks in its competitive area. To be comparable, a mobile home park must offer similar facilities, services, amenities, and management.[34]

### 3.10 The park owner may not interfere with the assumption of the resale seller's existing prospectus by the resale home purchaser

17.     The resale mobile home owner has a statutory right to sell his or her home and accompanying pre-existing prospectus. The resale purchaser also has an express statutory right to assume the resale seller's existing prospectus:

- A purchaser of a mobile home has the right to assume the remainder of the term of any rental agreement then in effect between the park owner and the seller and shall be entitled to rely on the terms and conditions of the prospectus or offering circular as delivered to the initial recipient;[35]

- A park owner may increase the rental amount to be paid by the purchaser upon the expiration of the assumed rental agreement in an amount deemed appropriate by the mobile home park owner, so long as such increase is disclosed to the purchaser prior to his or her occupancy and is imposed in a manner consistent with the initial offering circular or prospectus and the Florida Mobile Home Act;[36]

- Lifetime leases and the renewal provisions in automatically renewable leases, both those existing and those entered into after July 1, 1986, are not assumable unless otherwise provided in the mobile home lot rental agreement or unless the transferee is the home owner's spouse. The right to an assumption of the lease by a spouse may be exercised only

---

34      § 723.033(5)
35      § 723.059(3); *Rule* 61B-31.001(4), *Fla. Admin. Code:* (4) "The prospectus distributed to a home owner or prospective home owner shall be binding for the length of the tenancy, including any assumptions of that tenancy, and may not be changed except in the following circumstances: ..."
36      § 723.059(4)

one time during the term of that lease.[37]

**3.11    The Court has broad discretion to fashion relief for mobile homeowners**

18.    The Court may:

- find a mobile home lot rental amount, rent increase, or change, or any provision of the rental agreement, to be unreasonable. The court may enforce the remainder of the lot rental agreement without the unreasonable provision or limit the application of the unreasonable provision so as to avoid any unreasonable result;[38]

- find that a party to a lot rental agreement or duty under the Florida Mobile Home Act has not complied with its obligations of good faith and fair dealing and award reasonable attorneys fees and costs to the prevailing party for proving noncompliance;[39]

- rescind a contract or award damages to a mobile homeowner who reasonably relies upon any material statement or information that is false or misleading and published by or under authority from the park owner in advertising and promotional materials, including, but not limited to, a prospectus, the items required as exhibits to a prospectus, brochures, and newspaper advertising.[40]

---

37      § 723.059(5)
38      § 723.033(1)
39      § 723.021
40      § 723.017

## 4.0    Parties

### 4.1    Plaintiffs: Whispering Pines Mobile Homeowners' Association, Inc., of Kissimmee ("Whispering Pines HOA")

19.    Plaintiff Whispering Pines Mobile Homeowners' Association, Inc., of Kissimmee ("Whispering Pines HOA") is an incorporated Florida not-for-profit formed pursuant to § 723.075, *Fla. Stat*. The Association maintains a physical address and principal place of business at 1734 Balsam Ave., City of Kissimmee, County of Osceola, Florida. The Whispering Pines HOA complied with incorporation and service of the notice described in Sections 723.075(1), and 723.076(1), *Fla. Stat.,* and is the legal representative of the class of over 400 elderly current and past mobile home owners in all matters relating to the Florida Mobile Home Act, Chapter 723, *Fla. Stat.* The Plaintiff mobile homeowners ("Homeowners" or "Plaintiffs") currently reside or formerly resided in the Park in Osceola County, Florida. The members of the class herein are individual Homeowners as defined in Section 723.003(11), *Fla. Stat.* The Homeowners paid value toward the purchase of their mobile home or placement of their mobile home in the Park. They are the beneficiaries of automatically renewing periodic (at least annually) tenancies under the Florida Mobile Home Act, Chapter 723, *Fla. Stat*.

20.    The Whispering Pines HOA is authorized to file this action in its representative capacity under Rule 1.222 of the *Fla. R. Civ. P.* and Sections 723.075, *Fla. Stat.*[41] "Complete commonality" among the homeowners is not required by *Fla. R. Civ. P.*

---

[41]    § 723.075(1); *see also Rule 1.222: Fla. R. Civ. P.,* Mobile Homeowners' Associations, which reads:

A mobile homeowners' association may institute, maintain, settle, or appeal actions or hearings in its name on behalf of all homeowners concerning matters of common interest, including, but not limited to: the common property; structural components of a building or other improvements; mechanical, electrical, and plumbing elements serving the park property; and protests of ad valorem taxes on commonly used facilities. If the association has the authority to maintain a class action under this rule, the association may be joined in an action as representative of that class with reference to litigation and disputes involving the matters for which the association could bring a class action under this. Nothing herein limits any statutory or common law right of any individual homeowner or class of homeowners to bring any action which may otherwise be available. **An action under this rule shall not be subject to the requirements of rule 1.220.**

(Emphasis Added)

1.222. Nevertheless, the acts, practices, or omissions of these Defendants are matters of common interest of all of the homeowners represented by the Whispering Pines HOA.

21.     The officers and directors of the Whispering Pines HOA have a fiduciary relationship to the homeowners and must discharge their duties in good faith.[42]

22.     The Whispering Pines HOA has the authority to initiate mediation and litigation on behalf of all of the homeowners regarding an increase in lot rental amount, reduction in services or utilities, or change of rules and regulations.[43]

23.     If the park owner offers the Park for sale to the general public or receives an "unsolicited" offer to purchase the Park, the Whispering Pines HOA has a right to be notified of the offer, the price and the terms and conditions of sale, and permitted 45 days to execute a contract meeting the price, terms and conditions.[44] The Whispering Pines HOA has the express statutory right to negotiate for, acquire, and operate the mobile home park on behalf of the mobile home owners.[45]

## 4.2   Defendants

### 4.2.1   Kurt Wallach ("Kurt Wallach")

24.     Defendant Kurt Wallach ("Kurt Wallach") is an individual who currently resides or operates at 5230 St. Andrew Island Dr., Indian River County, City of Vero Beach, Florida. Kurt Wallach is an owner, President, Chief Executive Officer, and registered agent of Kurtell Growth Industries Ltd., a foreign (Texas) limited partnership. Kurtell Growth Industries Ltd., is a general partner to Defendant Sunny Lakes Capital, LLC, which is, in turn co-managed by Defendants Marilyn Wallach, Kurt Wallach's

---

*Lanca Homeowners, Inc. v. Lantana Cascade of Palm Beach, Ltd.*, 541 So.2d 1121 (Fla. 1988)("... we similarly note that the **unique features of mobile home residency call for an effective procedural format for resolving disputes between park owners and residents concerning matters of shared interest. Again, we recognize the usefulness of the policy sought to be asserted by the legislature.** Pursuant to Florida Rule of Judicial Administration 2.130(a), we adopt the following to be titled "*Mobile Homeowners' Association,*" to be numbered *Florida Rule of Civil Procedure 1.222*, and to be effective immediately....") (Emphasis Added)

42      § 723.078(2)(c)8
43      § 723.037(1)
44      § 723.071(1)(a)
45      §§ 723.077(1), 723.079(1) and (3)

spouse, and Mark Wallach, Kurt Wallach's son. Kurt Wallach has been the owner of and, at various times since 1997, either he or his spouse Marilyn Wallach have been the registered agent of Kurtell Growth Industries.

25.     Kurt Wallach, along with his spouse, Marilyn Wallach, and his son, Mark Wallach are co-managing members of Defendant Kurtell Management, L.L.C., since 2004 located at  5230 St. Andrew Island Dr., or 352 17th St., Indian River County, City of Vero Beach, Florida. Kurt Wallach, along with his spouse, Marilyn Wallach, and his son, Mark Wallach are also co-managing members of the following Kurtell-related defendant-entities at the above Vero Beach addresses: Sunny Lakes Capital, LLC (since 2014), Kurtell Holdings, LLC (since 2014); Kurtell Sales, LLC (since 2014); Kurtell Realty, LLC (since 2000); and Kurmar Capital, LLC (since 2010). Kurt Wallach is also engaged in business at Whispering Pines Mobile Home Park, 4658 Whispering Pines Blvd,, Osceola County, City of Kissimmee, Florida.

26.     Kurt Wallach is the "mobile home park owner" of Whispering Pines Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Kurt Wallach is also an "operator" of Whispering Pines Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who establishes a mobile home park on land owned by another person" or "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

### 4.2.2   Regina Wattles ("Wattles")

27.     Defendant Regina Wattles ("Wattles") is an individual who currently resides or operates at 352 17th St., or 5230 St. Andrews Island, Dr., Indian River County, City of Vero Beach, Florida.

28.     Wattles is the Executive Administrator at Defendant Kurtell Growth Industries, Ltd., since 1997, which also operates at 352 17th St., or 5230 St. Andrews Island, Dr., Indian River County, City of Vero Beach, Florida.

29.     Wattles is also engaged in business at Whispering Pines Mobile Home Park, 4658 Whispering Pines Blvd,, Osceola County, City of Kissimmee, Florida.

30.     Wattles is the "mobile home park owner" of Whispering Pines Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Wattles is also an "operator" of Whispering Pines Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

### 4.2.3   Marilyn Wallach ("Marilyn Wallach")

31.     Defendant Marilyn Wallach ("Marilyn Wallach") is an individual who currently resides or operates at 5230 St. Andrews Island, Dr., Indian River County, City of Vero Beach, Florida.

32.     Marilyn Wallach is the Secretary/Treasurer of Defendant Kurtell Growth Industries, Ltd., a Managing Member of Defendant Sunny Lakes Capital, LLC, a general partner of Defendant Kurtell Growth Industries, Ltd., since 2014, which operates at 352 17th St., or 5230 St. Andrews Island, Dr., Indian River County, City of Vero Beach, Florida.

33.     Marilyn Wallach, along with her spouse, Kurt Wallach, and their son,

Mark Wallach, are also co-managing members of the following Kurtell-related defendant-entities at the above Vero Beach addresses: Sunny Lakes Capital, LLC (since 2014), Kurtell Holdings, LLC (since 2014); Kurtell Sales, LLC (since 2014); Kurtell Realty, LLC (since 2000); and Kurmar Capital, LLC (since 2010). Marilyn Wallach is also engaged in business at Whispering Pines Mobile Home Park, 4658 Whispering Pines Blvd,, Osceola County, City of Kissimmee, Florida.

34.     Marilyn Wallach is the "mobile home park owner" of Whispering Pines Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Marilyn Wallach is also an "operator" of Whispering Pines Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

### 4.2.4   Mark Wallach ("Mark Wallach")

35.     Defendant Mark Wallach ("Mark Wallach") is an individual who currently resides or operates at 501 44th Ave., SW, or 352 17th St., in Indian River County, City of Vero Beach, Florida.

36.     Mark Wallach is the Director of Acquisitions & Marketing at Defendant Kurtell Growth Industries, Ltd. Mark Wallach, along with his mother, Marilyn Wallach, and his father, Kurt Wallach are co-managing members of Defendant Kurtell Management, L.L.C., since 2004 at  5230 St. Andrew Island Dr., or 352 17th St., Indian River County, City of Vero Beach, Florida. Mark Wallach, along with his mother, Marilyn Wallach, and his father, Kurt Wallach are also co-managing members of the following Kurtell-related defendant-entities at the above Vero Beach addresses: Sunny Lakes Capital, LLC (since 2014), Kurtell Holdings, LLC (since 2014); Kurtell Sales, LLC (since 2014); Kurtell Realty, LLC (since 2000); and Kurmar Capital, LLC (since 2010).

Mark Wallach is also engaged in business at Whispering Pines Mobile Home Park, 4658 Whispering Pines Blvd,, Osceola County, City of Kissimmee, Florida.

37.    Mark Wallach is the "mobile home park owner" of Whispering Pines Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Mark Wallach is also an "operator" of Whispering Pines Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

**4.2.5   John Muschaweck ("Muschaweck")**

38.    Defendant John Muschaweck ("Muschaweck) is an individual who currently resides at 1749 Western Redwood Ave., in Osceola County, City of Kissimmee, Florida. Muschaweck is an employee of Defendants Kurtell Growth Industries and Kurtell Management, LLC. He is the resident Park Manager for Defendants Kurtell Growth Industries, Kurtell Management, LLC, Kurmar Capital, LLC and operates at Whispering Pines Mobile Home Park, 4658 Whispering Pines Blvd,, Osceola County, City of Kissimmee, Florida.

39.    Muschaweck is the "mobile home park owner" of Whispering Pines Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Muschaweck is also an "operator" of Whispering Pines Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

**4.2.6   Kurtell Growth Industries, Ltd. ("Kurtell Growth Industries")**

40.   Defendant Kurtell Growth Industries, Ltd., ("Kurtell Growth Industries"), is a foreign (Texas) limited partnership since 1994. Kurtell Growth Industries Ltd., is a general partner to Defendant Sunny Lakes Capital, LLC, which is, in turn co-managed by Defendants Marilyn Wallach, Kurt Wallach's spouse, and Mark Wallach, Kurt Wallach's son. Kurt Wallach has been the owner of and, at various times since 1997, either he or his spouse Marilyn Wallach have been the registered agent of Kurtell Growth Industries. Kurtell Growth Industries operates at Whispering Pines Mobile Home Park, 4658 Whispering Pines Blvd., Osceola County, City of Kissimmee, Florida.

41.   Kurtell Growth Industries is the "mobile home park owner" of Whispering Pines Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Kurtell Growth Industries is also an "operator" of Whispering Pines Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." Kurtell Growth Industries is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

**4.2.7   Sunny Lakes Capital, LLC. ("Sunny Lakes Capital")**

42.     Defendant Sunny Lakes Capital, LLC ("Sunny Lakes Capital"), is a
Florida limited liability company since 2014, and a general partner of Defendant Kurtell
Growth Industries, Ltd., since 2014, which operates at 352 17th St., or 5230 St. Andrews
Island, Dr., Indian River County, City of Vero Beach, Florida. Sunny Lakes Capital
operates at Whispering Pines Mobile Home Park, 4658 Whispering Pines Blvd., Osceola
County, City of Kissimmee, Florida.

43.     Sunny Lakes Capital is the "mobile home park owner" of Whispering
Pines Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an
"owner" or "operator." Sunny Lakes Capital is also an "operator" of Whispering Pines
Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been
delegated the authority to act as the park owner in matters relating to the administration
and management of the mobile home park, including, but not limited to, authority to
make decisions relating to the mobile home park." Sunny Lakes Capital is a "person" as
defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations,
joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries,
corporations, and all other groups or combinations." "The singular includes the plural
and vice versa." §1.01(1), *Fla. Stat.*

**4.2.8   Kurtell Management Company, LLC ("Kurtell Management")**

44.     Defendant Kurtell Management Company, LLC ("Kurtell Management"),
is a Florida limited liability company since 2004 , which operates at 352 17th St., or
5230 St. Andrews Island, Dr., Indian River County, City of Vero Beach, Florida. Kurtell
Management is also engaged in business at Whispering Pines Mobile Home Park, 4658
Whispering Pines Blvd., Osceola County, City of Kissimmee, Florida.

45.     Kurtell Management is the "mobile home park owner" of Whispering
Pines Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner"

or "operator." Kurtell Management is also an "operator" of Whispering Pines Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." Kurtell Management is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

### 4.2.9   Kurtell Holdings, LLC ("Kurtell Holdings")

46.     Defendant Kurtell Holdings, LLC ("Kurtell Holdings") is a Florida limited liability company since 2014 , which operates at 352 17th St., or 5230 St. Andrews Island, Dr., Indian River County, City of Vero Beach, Florida. Kurtell Holdings is also engaged in business at Whispering Pines Mobile Home Park, 4658 Whispering Pines Blvd., Osceola County, City of Kissimmee, Florida.

47.     "Kurtell Holdings" is the "mobile home park owner" of Whispering Pines Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Kurtell Holdings is also an "operator" of Whispering Pines Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." Kurtell Holdings is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

### 4.2.10  Kurtell Sales, LLC ("Kurtell Sales")

48.     Defendant Kurtell Sales ("Kurtell Sales"), is a Florida limited liability company since 1990 , which operates at 352 17th St., or 5230 St. Andrews Island, Dr., Indian River County, City of Vero Beach, Florida. Kurtell Sales is also engaged in business at Whispering Pines Mobile Home Park, 4658 Whispering Pines Blvd., Osceola County, City of Kissimmee, Florida.

49.     Kurtell Sales is the "mobile home park owner" of Whispering Pines Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Kurtell Sales is also an "operator" of Whispering Pines Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." Kurtell Sales  is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

### 4.2.11  Kurtell Realty, LLC ("Kurtell Realty")

50.     Defendant Kurtell Realty, LLC ("Kurtell Realty") is a Florida limited liability company since 2000, which operates at 352 17th St., or 5230 St. Andrews Island, Dr., Indian River County, City of Vero Beach, Florida. Kurtell Realty is also engaged in business at Whispering Pines Mobile Home Park, 4658 Whispering Pines Blvd., Osceola County, City of Kissimmee, Florida.

51.     Kurtell Realty is the "mobile home park owner" of Whispering Pines Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Kurtell Realty is also an "operator" of Whispering Pines Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority

to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." Kurtell Realty is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

**4.2.12  Kurmar Capital, LLC ("Kurmar Capital")**

52.     Defendant Kurmar Capital, LLC ("Kurmar Capital") is a Florida limited liability company since 2010, which operates at 352 17th St., or 5230 St. Andrews Island, Dr., Indian River County, City of Vero Beach, Florida. Kurmar Capital is also engaged in business at Whispering Pines Mobile Home Park, 4658 Whispering Pines Blvd., Osceola County, City of Kissimmee, Florida.

53.     Kurmar Capital is the "mobile home park owner" of Whispering Pines Mobile Home Park as defined by §723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Kurmar Capital is also an "operator" of Whispering Pines Mobile Home Park as defined by §723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." Kurmar Capital is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

## 5.0     Class Representation Allegations

54.     Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated, pursuant to *Federal Rule of Civil Procedure* 23.

55.     The proposed Class consists of all persons who are or were homeowners in the Whispering Pines Mobile Home Park from 2009 to the present and have identical, or substantially similar underlying mobile home lot rental agreements with identical or substantially similar restrictions or sub-parts.

56.     The Class includes those Plaintiffs who have been forced or expect to be forced to be fraudulently deceived by the Defendants through the scheme to circumvent the statutory regulations intended to protect the mobile homeowners. That scheme includes the Defendants extortionate threats to their representative incorporated homeowner association and its board of directors to not complain about violations of the Florida Mobile Home Act, Chapter 723, *Fla. Stat.* That scheme includes the fraudulent rejection by the Defendants of the Whispering Pines HOA's other park comparables resulting in the increased lot rental on factors not recognized by the Florida Mobile Home Act.

57.     The Class includes those Plaintiffs who have paid the improper lot rental or received  threats of liens or eviction or restrictions of their use of Park facilities or amenities for their nonpayment.

58.     The Class includes those Plaintiffs who have received a reduction in services and of their resale home values.

59.     Moreover, each Class Members' tangible and intangible rights to the continued access to the Park's facilities or amenities (RV storage spaces, and other facilities serving the needs of the Class members) have been injured.

60.     Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that market or sell homes in Whispering Pines

Mobile Home Park, the judge(s) assigned to this case, and the attorneys of record in this case. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

61.     This action is properly brought as a class action because:

(a)     The proposed Class is so numerous and geographically dispersed throughout the United States that the joinder of all Class Members is impracticable. The number of Class members is approximately 400 persons, and is expected to grow as homes in Whispering Pines Mobile Home Park are resold. Many of the Class Members are seasonal residents of Florida and reside in other portions of the United States during the remainder of the year.

(b)     The disposition of Plaintiffs' and proposed Class Members' claims in a class action will provide substantial benefits to both the parties and the Court;

(c)     The proposed Class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed Class Member were infringed or violated in the same or similar fashion and uniform manner;

(d)     There are questions of law and fact common to the proposed Class which predominate over any questions that may affect particular Class Members. Such common questions of law and fact include but are not limited to:

1.     Whether Defendants violated 18 U.S.C. § 1962;

2.     Whether Defendants violated Title 3 of the ADA - 42 U.S.C. § 12181 *et seq.*;

3.     Whether Defendants violated 42 U.S.C. §§ 3601 et seq., the Fair Housing Act;

4.     Whether the Defendants violated 15 U.S.C. § 1681, the Fair Credit Reporting Act;

5.     Whether Defendants violated the Florida Mobile Home Act, Chapter 723, *Fla. Stat.*;

6.     Whether Defendants violated the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Part II, Chapter 501, *Fla. Stat.*;

7      Whether the Defendants violated Florida's fair housing laws, §§ 760.23 and 760.35, *et seq., Fla. Stat.*;

8.     Whether the Defendants violated Florida's laws prohibiting discrimination by places of public accommodation, §§760.07, and 760.08, *et seq., Fla. Stat.*;

9.     Whether Plaintiffs and Class Members have been harmed and the proper measure of relief;

10.    Whether Plaintiffs and Class Members are entitled to an award of treble damages, punitive damages, attorneys' fees and costs; and

11.    Whether, Plaintiffs and Class Members are entitled to equitable relief, and if so, the nature of such relief.

(e)     Plaintiffs' claims are typical of the claims of the members of the proposed Class. Plaintiffs and Class Members have been injured by the same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all Class Members and are based on the same legal theories;

(f)     Plaintiffs will fairly and adequately protect the interests of the Class in that they have no interests antagonistic to those of the other Class Members, and Plaintiffs have retained an attorney experienced in consumer class actions and complex litigation as counsel;

(g)     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

1.     Given the size of individual Class Members' claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them and absent Class Members have no substantial

Page 37

interest in individually controlling the prosecution of individual actions;

2.  This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered and uniformity of decisions will be insured;

3.  Without a class action, Class Members will continue to suffer damages, and Defendants' violations of law will proceed without remedy while Defendants continue to reap and retain the proceeds of their wrongful conduct; and

4.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude class certification.

62.  Defendants and their agents had, or have access to, address information for the Class Members, which may be used for the purpose of providing notice of the class action.

63.  Plaintiffs seek damages and equitable relief on behalf of the Class on grounds generally applicable to the entire proposed Class.

### 6.0     The Scheme:

**Since 2016, the Defendants threatened, terrorized, and marginalized over 400 elderly mobile home owners and their representative incorporated homeowners' association, the Whispering Pines HOA, to support Defendants' fraudulent and deceptive scheme to increase lot rental and associated fees without regard for the homeowners' statutory rights under the Florida Mobile Home Act**

65.     The Defendants provided the Plaintiff elderly home owners via U.S. Mail and the Internet <http://www.whisperingpinesmhc.com> the following glowing reports of life at Whispering Pines Mobile Home Park:

Welcome to Whispering Pines

Welcome to Whispering Pines Manufactured Home Community, a planned and gated 55+ community tucked away in a relaxed, country atmosphere in Kissimmee, Florida. This quiet, carefree neighborhood is designed in harmony with the beauty of the natural wooded surroundings while offering a reasonable cost of living.

*****

A Preview of Our Community:

- Gated Community
- Outdoor Heated Pool and Spa
- Clubhouse for Residents
- Library/Card Room
- Shuffleboard Courts
- Gazebo/Picnic Area
- Double-Wide Manufactured Homes
- Horseshoe pits
- Billiards Room
- Exercise Center

*****

We also have Security Cameras on the Gates and Post
Office Boxes. These cameras also can be accessed by any
resident who has cable TV. The Post Office Boxes have a
"Ready Light" that goes on to tell residents the mail is in.
Then they can make the trip to the clubhouse area for their
mail.

*****

Home values within Whispering Pines are protected
by homeowner regulations as well as by management's
attention to the appearance and maintenance of the
community. Our professional management team is on-site
for your peace of mind.

Hear more about the many amenities you'll enjoy by
contacting us at (800) 848-8119 or (407) 847-2407 in
Kissimmee, Florida.

68.     The Plaintiff-homeowners entered into a mobile home lot rental agreement

with the Defendants. Statutory provisions of Chapter 723 are deemed to be part of their

lot rental agreement under § 723.031(2). Every rental agreement or duty within Chapter

723 imposes upon Defendants an express obligation of good faith and fair dealing under §

723.021, *Fla. Stat.*

69.     Under § 723.022, *Fla. Stat.*, the Defendants must:

- comply with requirements of applicable building, housing, and health codes (§ 723.022(1));

- maintain buildings and improvements in common areas in a good state of repair and maintenance (§ 723.022(2));

- maintain common areas in a good state of appearance, safety, and cleanliness (§ 723.022(2));

- provide access to the common areas, including buildings and improvements, at all reasonable times for the benefit of the park residents and their guests (§ 723.022(3));

Page 40

- maintain utility connections and systems in proper operating condition (§ 723.022(4));

- comply with properly promulgated park rules and regulations; (§ 723.022(5));

- conduct themselves in a manner that does not unreasonably disturb other residents of the park or constitute a breach of the peace (§ 723.022(5)).

**6.1   Defendants unreasonably eliminated or reduced services and Park facilities without 90 day notice or corresponding reduction in lot rent**

70.   The Defendants unreasonably eliminated or reduced services and the Park facilities without a corresponding 90 day advance written notice or a corresponding reduction in lot rent, in violation of Sections 723.021, 723.022, 723.037, and 513.014, *Fla. Stat*. More specifically:

**6.1.1   Pool, Hot-tub/spa**

1. The Park swimming pool bottom is frequently discolored and unsightly, causing homeowners to question its cleanliness;

2. Defendants also neglect to clean or repair the pool furniture, resulting in dirty, broken, and mismatched furniture. The pool furniture is flimsy as it is older furniture. The Pool umbrella stands easily tip over, causing a safety hazard;

3. The Park clubhouse restrooms are not handicapped accessible, resulting in numerous homeowners avoiding socialization at daily, weekly, and monthly meetings of the Whispering Pines HOA and associated social activities;

### 6.1.2   Security

1.   The Defendants are unresponsive to homeowner or law enforcement reports of criminal behavior in the Park. The Defendants have neglected to provide law enforcement standing permission to issue trespass orders to strangers who enter the Park;

2.   The Park gate security camera system is inoperative and has been inoperative for weeks and months at a time. The Defendants claim they have neither the budget or time to repair the gate and default to leaving it open at all hours of day and night.

### 6.1.3   Clubhouse

1.   Defendants refuse to make the Park clubhouse and facilities ADA compliant, despite a number of disabled elderly citizens who reside or visit in the Park. The Defendants regularly meet with and encourage the general public to enter the clubhouse facilities to discuss Park business and permit outside guests and vendors to traverse the Park facilities. The Defendants have no security or supervision of members of the general public who use the clubhouse facilities. Although a ramp was built for handicap accessibility into the clubhouse, it is not accessible as there is no way to open the door or roll over the initial "bump" on the ramp.

The swimming pool, public restrooms, and clubhouse meeting hall are not handicapped accessible. What was done was to build a ramp into the clubhouse with a turnaround space, but no electronic button to open the door, thus requiring wheelchair bound persons to have assistance to enter the building.  This is the same problem

with the restrooms in the clubhouse (photos below adopted);






### 6.1.4   Common Areas - Facilities, lighting, landscaping, etc.

1.  The Park drainage ditches need repair and thorough cleaning to prevent backup of storm water throughout the Park;

2.  There are inadequate Park-wide water shut-off valves. The shut-off valves for each home were buried and often defective;

3.  Partial power outages in the Park are common occurrences;

4.  The Park drinking water tastes bad: some homeowners refuse to drink it unfiltered;

5.  The Park sewage system often has awful odors. Homeowners report a near-constant foul odor.  One homeowner reported open sewage flowed into their front yard. The sewage treatment system is also very loud and disturbs homeowners in the Park.

6.  The Defendants previously provided free R.V. storage. Since Defendant Muschaweck became manager, the Defendants have charged $35 per month for R.V. storage.

### 6.1.5   Common Areas - Streets

1.  The streets throughout the Park are in disrepair, crumbling and dangerous to pedestrians and vehicular traffic;

2.  Streets throughout the Park are unsightly. Grass grows in some of the cracks in the pavement;

3.  Some street drains have sunk causing uneven pavement and a safety hazard for those Plaintiff-homeowners who walk, or ride bikes and golf carts;

4.  Flooding in some areas of the Park during the rainy season is horrendous;

5.  The streets are frequently flooded which takes hours to drain. A

storm drain collapsed creating a large hole in street;

6. There is a history of Park storm sewers eroding.

### 6.1.6   "55 and Older" Park

1. Defendants refuse to comply with the direction of the Florida Legislature to certify or identify the Park as 55 and older status. Defendants increasingly sell or rent homes to persons considerably younger than 55 years of age.

2. Defendants have permitted children in the Park and the shared facilities in the Park to remain in excess of the limited duration requirements of the properly promulgated Park rules and regulations;

3. Defendants have failed to supervise or restrict children in the shared facilities in the Park as required by the properly promulgated Park rules and regulations. Teens frequently drive golf carts without supervision.

### 6.2   Setting the stage for the Scheme:

**In 2015 the Defendants tried to evict an elderly homeowner and Whispering Pines HOA Board member in retaliation for his complaints that the Defendants violated the Florida Mobile Home Act**

71. In an August 2014 lengthy memorandum to Kurt Wallach, an elderly Whispering Pines HOA Board member and homeowner Roy Anderson described, *inter alia*, Park management as:

- rude and non-responsive;
- gossiping about homeowners' personal problems;
- frequently out of the office or unavailable;
- issuing large numbers of rule violation notices;
- not following up on rules violation notices.

72.     In the same August 2014 memorandum to Kurt Wallach, Roy Anderson further described, *inter alia*, Park maintenance as:

- roadways in poor shape;
- park fencing discolored and stained from mold;
- park fence along the property line on White Pine Avenue is coming apart;
- yard debris in the Park raked and left in loose piles for months;
- camera on back entrance gate inoperative;
- Excessive tree limb overgrowth in sewer plant area;

73.     In the same August 2014 memorandum to Kurt Wallach, Roy Anderson further described, inter alia,  unaddressed rules violations as:

- many homes are not washed;
- many lawns are not mowed or edged regularly;
- grass and weeds are out of control;
- excessive flower pots with plastic flowers;
- many aggressive unleashed dogs in the Park;
- cars parking in the street and the grass;
- at least one home squatter with 5 cats and 2 unleashed dogs. He threatened other residents as well as the manager;
- many yards and carports still contain items and junk;
- some home owners are storing stuff behind their house;
- many children spending more time and/or temporarily living in the park; and
- painting of houses, driveways, concrete work, etc., never reviewed and approved by management.

74.     In a September 11, 2015 letter from Kurt Wallach to Whispering Pines HOA President Jim McCarthy, Kurt Wallach invited all members of the HOA Board (except for Director Roy Anderson who was "being evicted.") to drive down to Vero Beach: "In order to straighten out so much nonsense now being observed...." Whispering Pines HOA President Jim McCarthy responded via letter that the HOA refused such a meeting.

75.     On October 16, 2015 Kurt Wallach then responded to Pres. McCarthy:

*****

Dear Mr. McCarthy:

It is evident that **you have much to learn** about what a Home Owners Association is about. It has no managerial duties, management or power. **Your illusions** of these will be dealt with as you will learn, it **may become a costly pill for you**. Other members who may wish to continue in the torturous [sic.] interference with this company's management of this, or other owned properties, **will also need to pay the price**.

Let me briefly outline the current situation.

1.      This company gave you the opportunity to meet with Mr. Wallach. That opportunity is now withdrawn.

2.      **We accuse you of interfering in our business. This will be dealt with via evictions from our property.**

3.      **The first, and as we see, most guilty is now to be evicted. For your sake, understand if interference continues more evictions will follow.**

4.      Should the company chose to evict a home rather than an individual, we will do so. The costs of tearing down, splitting the sections, and moving the house will likely cost $35,000. We have chosen not to evict a home now, but only its occupant.

The **company will evict Roy Anderson**. At this writing this is the only presently planned. **It is suggested that you stay clear of further interference since no other actions are now in the works**.

Sincerely Yours,

Kurt Wallach
CEO

[Emphasis Added]

76.     On December 30, 2015 Kurt Wallach, through Defendant Kurmar Capital, filed an eviction action against Whispering Pines HOA Director Roy Anderson in Osceola County Court, Case No. 2015-CC-002391. The exhibits to the Complaint for eviction were wholly fraudulent, perjurous, and manufactured by Defendants Kurt Wallach, Marilyn Wallach, and Muschaweck. Anderson was required to hire an attorney to successfully defend this eviction at a cost of $1,700.

77.     In the complaint for eviction, the Defendants accused Anderson of "inciting discontent," "creating a hostile environment" for the Defendants' Park employees, "badgering park managers with oral frivolous complaints," and harassing the Park staff. In an exhibit to the complaint for eviction, Defendant Kurt Wallach wrote on September 9, 2015 in a letter to Anderson that "We have reviewed your damaging and unacceptable behavior for a long time and conclude that for the quiet and peaceful tenancy of our residents, Whispering Pines would be a better place to live with you no longer being a resident of our community."

78.     Section 723.061(1), *Fla. Stat.*, prohibits even a properly promulgated rule or regulation from being arbitrarily applied or used as a ground for eviction. Section 723.0615(1), *Fla. Stat.*, declares retaliation unlawful:

> (1)     It is unlawful for a mobile home park owner to discriminatorily increase a home owner's rent or discriminatorily decrease services to a home owner, or to bring or threaten to bring an action for possession or other civil action, primarily because the park owner is retaliating against the home owner. In order for the home owner to raise the defense of retaliatory conduct, the home owner must have acted in good faith and not for any improper purposes, such as to harass or to cause unnecessary delay or for frivolous purpose or needless increase in the cost of litigation. **Examples of conduct for which the park owner may not retaliate include, but are not limited to, situations where:**

     (a)     The home owner has in good faith complained to a governmental agency charged with responsibility for enforcement of a building, housing, or health code of a suspected violation applicable to the mobile home park;

     (b)     **The home owner has organized, encouraged, or participated in a homeowners' organization; or**

     (c)     **The home owner has complained to the park owner for failure to comply with s. 723.022.**

*****

Section 723.0615, *Fla. Stat.* (Emphasis added)

79.     Subsequently, on May 11, 2016, Kurt Wallach and Kurmar Capital dismissed the eviction case.

**6.3     In 2016 phone conversation with Whispering Pines HOA President and Director Brian Norton to schedule a statutorily required meeting at a "mutually convenient" meeting place, an irate and abusive Defendant Kurt Wallach yelled that: "You can just get your ass down here to Vero!"**

80.     In July 2016 Whispering Pines HOA President Brian Norton spoke with Defendant Kurt Wallach regarding area arranging a mutually convenient meeting place and time to conduct the initial statutory meetings required by Section 723.037, *Fla. Stat.* When Pres. Norton told Mr. Wallach that is was not convenient for the Homeowners Committee of the HOA to travel the two plus hours to Vero Beach, Florida, Kurt Wallach became irate, loud, and exclaimed "You can just get your ass down here to Vero!"

81.     In a subsequent letter to Pres. Norton, Kurt Wallach remarked that: "... [Y]ou (your committee) are novices in our industry and feel you do not serve the folks you represent unless you make trouble. It reminded me of this Anderson guy, also totally ignorant of our industry who thrives on creating problems...."

**6.4    At a 2016 meeting in the Park clubhouse with the Whispering Pines HOA, Defendant Kurt Wallach battered his wife, Defendant Marilyn Wallach in the presence of the Plaintiffs. An angered Kurt Wallach then stood over a board member of the Whispering Pines HOA and yelled that: "If some of you don't like it [the conditions in the Park] you can just move."**

82.    At a 2016 meeting in the Park clubhouse with the Whispering Pines HOA and in response to Defendant Marilyn Wallach's insistence that he not be combative with the homeowners, Kurt Wallach battered Marilyn Wallach and shoved her in the direction of the clubhouse exterior. Uttering profanities, he ordered her to shut her mouth and wait in the un-air conditioned car.  One of the board members, Jan Eckhardt, calmly observed that Kurt Wallach had sent his wife outside without the car keys in the middle of a hot day and that he should have not ordered to stand outside without air conditioning. Kurt Wallach responded angrily that she can stand in the sun as "no woman speaks to me like that."

83.    Kurt Wallach then glowered at Mrs. Eckhardt and stood over her, yelling that: "If some of you don't like it [the conditions in the Park] you can just move."

**6.5    Since 2016 at initial statutory and mediation meetings with the Whispering Pines HOA, the Defendants fraudulently rejected the Whispering Pines HOA's other suggested mobile home park lot rental comparables as not being in the same "breed" of double-wide Parks like Whispering Pines**

84.    Since 2016, the Defendants rejected the Whispering Pines HOA's submission of other park comparables, in violation of §723.037, *Fla. Stat.*, and the express statutory public policy that encourages the good faith exchange and discussion regarding comparable parks in review of the lot rental amounts in the Park. In a July 31, 2018 letter to Whispering Pines HOA Director Michael Howard, Kurt Wallach rejected any of the mobile home park comparables suggested by Whispering Pines HOA. Kurt Wallach concluded that Whispering Pines Mobile Home Park's full double-wide custom-built homes is a distinguishing characteristic rendering rental comparisons improper:

> There is, of course, no comparisons as our wide (no less
> than 24') custom built homes are **another breed**. The list of
> comparisons and competitive prices include only custom built
> and fine edifices. **Our amenities are the finest as is our staff
> which we consider to be the bes**t....

(Emphasis added)

The Defendants' illegal disregard of the Plaintiffs' suggested alternative Park lot rental comparables caused the Plaintiff-homeowners to pay more in rent than they otherwise would have: an increase of the average monthly lot rental in the Park by $64 from 2016 through 2018 based on deceptive statements and conduct of the Defendants.

85. Section 723.033(5), *Fla. Stat.*, reads: "In determining market rent, the court may consider rents charged by comparable mobile home parks in its competitive area. **To be comparable, a mobile home park must offer similar facilities, services, amenities, and management.**" (Emphasis added) There is no statutory basis for the Defendants to reject the Plaintiff Whispering Pines HOA park comparables and instead base the lot rental, on the double-wide status of the homes in the Park.

**6.6   Since 2016 the Defendants have acted and conspired to discourage participation and cooperation by the elderly homeowners with the Whispering Pines HOA by, *inter alia*, requiring that all Park events or activities be organized through the Defendants**

86. Since 2016 Defendant Muschaweck has openly expressed on numerous occasions in conversations with homeowners in the Park that it is his and Kurt Wallach's intent to "destroy" the Whispering Pines HOA to silence their criticism of the Defendants. In addition to discouraging new homeowners from engaging the Whispering Pines HOA, the Defendants have acted and conspired to require that all Park events or activities be organized through the Defendants.

Page 51

**6.7** **Since 2016 the Defendants have illegally and arbitrarily negatively impacted the resale value of the homes in the Park**

87.      Since 2016 the Defendants have illegally and arbitrarily negatively impacted the resale value of the homes in the Park by:

- Increasing the lot rental amount in an arbitrary manner;

- Imposing a RV storage fee of $35 per month (previously free);

- Failing to respond to security issues in the Park, including, but not limited to, failing to maintain the security gates;

- Failing to maintain the stormwater drainage and sewage systems;

- Failing to enforce the rules and regulations; and

- Openly frustrated the continued 55 and older status by refusing to renew the legislatively required certification that the Park is 55 and older and by continuing to allow persons younger than 55 to purchase, rent or occupy homes in the Park.

**6.8** **In 2019 the Defendants illegally denied the occupancy of a caregiver-daughter of an elderly homeowner and former board member of Whispering Pines HOA in retaliation for his complaints that the Defendants violated the Florida Mobile Home Act. The Defendants also threatened to evict the elderly homeowner and his spouse which the homeowner: "… cannot win and will result in a large attorney's fee award" for Kurt Wallach and the removal of their family from the Park**

90.      Beginning in 2018 and continuing through the filing of this Complaint, the Defendants have threatened to evict elderly Plaintiff-homeowners Joyce Berry, Kenneth Leidinger, and their 48 year-old daughter, Deana Swank. Kenneth Leidinger is a former Board member and President of Plaintiff Whispering Pines HOA.  In his years on the Board of the Whispering Pines HOA, Leidinger was appropriately contentious and tracked numerous instances where the Defendants were in violation of the Florida Mobile Home Act. Leidinger represented the interests of the class of over 400 elderly homeowners in interactions and negotiations with the Defendants to reduce the ever-increasing lot rental

amount on behalf of themselves and the Plaintiff-homeowners.

91.     In 2016, Leidinger played an important role (known to the Defendants) in the eventual consultation and employment of the undersigned attorney to investigate and prosecute this Complaint. For health reasons (of himself and his spouse, Joyce Berry), Leidinger is no longer on the Board of the Whispering Pines HOA but remains a homeowner in the Park.

92.     Leidinger and Berry had previously obtained the approval of the Defendants for their daughter, Deana Swank  to co-occupy their mobile home in the Park. For several months in 2015, Deana lived with them and acted as their caregiver. Subsequent to that approval and residence, Deana left the Park and lived outside of the Park in the same County of Osceola. In June 2016, Deana Swank was arrested outside of the Park and later convicted for possession of a felony amount of cocaine and a felony charge of carjacking. Neither the commission of the offenses nor the arrests occurred in the Park or were, in any fashion, related to the Park. Upon the conclusion of a lengthy prison sentence and subsequent supervision by the Department of Corrections, Plaintiff-homeowners Joyce Berry and Kenneth Leidinger sought to have their care-giver daughter return to co-occupy their mobile in the Park.

93.     Plaintiff-homeowners Joyce Berry and Kenneth Leidinger submitted an application for Deana Swank's residency in the Park, paid a background check fee and made full disclosure of Deana's criminal record the commission of which had occurred outside of the Park and her subsequent successful drug rehabilitation and certification of her training as a care-giver. The Defendants rejected Deana's application for residency. The Defendants recognized Berry and Leidinger's need for a caregiver but concluded that Deana posed too great of a risk to the other homeowners in the Park. The Defendants based this conclusion simply upon Deana's criminal record and made no effort to investigate the  circumstances of the offenses.

94.     Even a casual investigation of the facts of the car-jacking offense would have shown that Deana Swank pled guilty to the offense upon the advice of an attorney with only one year experience as a lawyer. Her offense involved no violence or force other than jumping into the driver's seat of a car parked at a service station, engaging the ignition and driving the car away. The arrest report reveals no threats or violence directed to the teen-age male passenger in the car. She drove the car for several blocks, pulled over, and ran off before she was apprehended. Her offense, then, amounted to little more than a felony grand theft auto. Under a proper charge under Florida's guideline sentencing, she should have received less than one year in the county jail rather than the multi-year prison sentence she served.

95.     Pursuant to § 723.061(1), *Fla. Stat.*, "A mobile home park owner may evict a mobile home owner, a mobile home tenant, a mobile home occupant, or a mobile home **only** on one or more of the following grounds ...:

> (b)     Conviction of a violation of a federal or state law or local ordinance, **if the *violation* is detrimental to the health, safety, or welfare of other residents of the mobile home park.** The mobile home owner or mobile home tenant must vacate the premises within 7 days after the date the notice to vacate is delivered. This paragraph constitutes grounds to deny an initial tenancy of a purchaser of a home under paragraph (e) or to evict an unapproved occupant of a home.
>
> *****
>
> **A properly promulgated rule or regulation *may not be arbitrarily applied and used as a ground for eviction.***
>
> *****

§ 723.061(1), *Fla. Stat.* (Emphasis Added)

96.     On January 8, 2019, Defendant Muschaweck wrote a letter to Plaintiff-homeowners Joyce Berry and Kenneth Leidinger denying the residency of Deana Swank:

*****

On January 4th 2019 you requested that your daughter Deana Swank be allowed to reside in the Whispering Pines Community as your caregiver. You specifically indicated you needed a caregiver due to your declining health. Although we understand you may need a qualified caregiver to assist you, Deana would not meet the expectations to be a member of our community.

This decision was made in conjunction with our corporate office, **based on Deana's background she could potentially pose an elevated risk to our residents in the community.**

*****

97.     On February 8, 2019, Defendant Kurt Wallach wrote  a letter to Plaintiff-homeowners Joyce Berry and Kenneth Leidinger again denying the residency of Deana Swank (and including a passing reference to Kenneth Leidinger's service as a director of the Whispering Pines HOA):

*****

**We are very aware of your health situation** and your desire to have your daughter be your caregiver. We have carefully assessed the circumstances and do not make this decision without merit. Unfortunately she is NOT approved to live in our community in accordance with our guidelines.

**It is irrelevant that she did not commit crimes in our park, we would be held liable for events that may occur in the future. Mr. Leidinger, you have always been a strong supporter of screening prospective tenants, guests, and caregivers** that we have allowed in our community, we cannot make an exception for your daughter.

*****

Page 55

And, finally, on February 25, 2019, Defendants Kurt Wallach and Muschaweck wrote or co-authored and caused a letter to be sent via United States mail to Plaintiffs Kenneth Leidinger and his spouse, Joyce Berry, that accused them of "harboring a convicted criminal" [their daughter Deana Swank], directing her to be permanently barred from returning to the Park and that a police officer will be "monitoring this situation to be sure it goes according to plan."

### 6.9    Mail and Wire Fraud

98.    Defendants (and their co-conspirators/agents) engaged in a scheme to unlawfully defraud Plaintiffs of their money or property. Defendants (and their co-conspirators/agents) knowingly devised or knowingly participated in a scheme or artifice to defraud Plaintiffs or to obtain the money or property of Plaintiffs by means of false or fraudulent pretenses, representations, material omissions, or promises.

99.    Defendants (and their co-conspirators/agents) could foresee that the U.S. Postal Service and interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. §§ 1341 and 1343.

100.    In particular, Defendants (and their co-conspirators/agents) knew or could foresee that the U.S. Postal Service and interstate wires would be used to receive and/or deliver, *inter alia,* the notices of lot rental increase..

101.    Defendants (and their co-conspirators/agents) acting singly and in concert, personally or through their agents, used the U.S. Postal Service and interstate wires or caused the U.S. Postal Service or interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud the Plaintiffs within the meaning of 18 U.S.C. §§ 1341 and 1343.

102.    It is not possible for Plaintiffs to plead with particularity all instances of mail and wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications are within the exclusive control and within the exclusive knowledge of Defendants (and their co-conspirators/agents) other presently unknown individuals.

103.    By way of example, however, Defendants (and their co-conspirators/ agents) specifically used the U.S. Postal Service or interstate wires or caused the U.S. Postal Service or interstate wires to deliver each and every telephone call, email, and letter described in paragraphs 7 - 23 and 65 -107, *supra*.

104.    Upon information and belief, some of the wire communications described above occurred between persons in the same state but crossed interstate borders by reason of the technology and other mechanisms used to transmit the communication.

105.    Each and every use of the U.S. Postal Service or interstate wires described above was committed by Defendants and their co-conspirators/agents with the specific intent to defraud Plaintiffs or for obtaining the money or property of Plaintiffs by means of false or fraudulent pretenses, representations, material omissions or promises. Defendants and their co-conspirators'/agents' acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B) or "criminal activity" as defined by *Fla. Stat.* § 772.102(b).

106.    Plaintiffs purchased their mobile homes and entered into a long-term lot rental agreement not knowing that the Defendants fraudulently and intentionally ignored the Defendants' statutory obligations under Section 723.022, *Fla. Stat.*

107.    Defendants' scheme to defraud was designed to victimize elderly homebuyers. As such, Defendants intended to take advantage of Plaintiffs' perceived

ignorance or gullibility and intended to prey on Plaintiffs' infirmities.

**6.10    Extortion**

108.    Defendants obstructed, delayed, or affected commerce and/or the movement of articles or commodities in commerce, by extortion or attempted or conspired to do so in violation of 18 U.S.C. § 1951.

109.    Defendants maliciously threatened an injury to Plaintiffs' property or reputation with intent thereby to extort money or pecuniary advantage or with intent to compel Plaintiffs to act or refrain from acting against their will in violation of *Fla. Stat.* § 836.05.

110.    Defendants obtained or attempted to obtain money and property from Plaintiffs, with their consent, induced by wrongful use of actual or threatened fear (*supra*). In particular, Defendants Kurt Wallach, Wattles, Marilyn Wallach, Muschaweck, and Kurtell Growth Industries drafted or caused Defendant Kurmar Capital to file an eviction action against a former director of the Whispering Pines HOA, Roy Anderson, and have illegally denied the residency of Deana Swank, the caregiver-daughter of another former director, Kenneth Leidinger, and his spouse, Joyce Berry (*supra*).

111.    Defendants' extortion was designed to victimize elderly homebuyers. As such, Defendants intended to take advantage of Plaintiffs' perceived ignorance or gullibility and intended to prey on Plaintiffs' infirmities.

## 7.0   Claims

**7.1   Count One – RICO; Racketeer Influenced and Corrupt Organizations Act**
Violation of 18 U.S.C. § 1962(c) – *Fla. Stat.* § 772.103(3) by Defendants Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach

115.   Plaintiffs reallege and restate paragraphs 1 through 111.

**7.1.1   *Kurt Wallach-Wattles-Muschaweck-Marilyn Wallach-Mark Wallach Enterprise***

116.   Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that they were "a group of individuals associated in fact" (hereinafter referred to as the "*Kurt Wallach-Wattles-Muschaweck-Marilyn Wallach-Mark Wallach Enterprise*").

  a. Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach shared the common purposes of developing Whispering Pines Home Park and defrauding Plaintiffs of money or property.

  b. Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach were related in that they are business partners and/or associates and owed to Plaintiffs a duty of good faith and fair dealing under § 723.021, *Fla. Stat.*

  c. The *Kurt Wallach-Wattles-Muschaweck-Marilyn Wallach-Mark Wallach Enterprise* possessed sufficient longevity for the members to carry out their purpose(s) in that the *Kurt Wallach-Wattles-Muschaweck-Marilyn Wallach-Mark Wallach Enterprise* existed from 2009 through 2019 (at a minimum).

  d. Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and

Mark Wallach are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the *Kurt Wallach-Wattles-Muschaweck-Marilyn Wallach-Mark Wallach Enterprise* through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in paragraphs 98 to 107), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 108 to 111).

### 7.1.2   Alternative 1: *Kurtell Management Enterprise*

117.   In the alternative to paragraph 116, between 2009 and 2019 (at a minimum), Kurtell Management constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

a.   Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of Kurtell Management through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla.*

*Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in paragraphs 98 to 107), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 108 to 111).

### 7.1.3   Alternative 2: *Whispering Pines Mobile Home Park Enterprise*

118.    In the alternative to paragraphs 116 and 117, Kurtell Management, Kurtell Holdings, and Kurmar Capital constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that they were "a group of individuals associated in fact" (hereinafter referred to as the "*Whispering Pines Mobile Home Park Enterprise*").

a.    Kurtell Management, Kurtell Holdings, and Kurmar Capital, shared the common purposes of defrauding Plaintiffs of money or property.

b.    Kurtell Management, Kurtell Holdings, and Kurmar Capital, were related in that they are all alter egos of Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach.

c.    The *Whispering Pines Mobile Home Park Enterprise* possessed sufficient longevity for the members to carry out their purpose(s) in that the *Whispering Pines Mobile Home Park Enterprise* existed from 2009 through 2019 (at a minimum).

d.    Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who

individually conducted, participated in, engaged in, and operated
and managed the affairs of the *Whispering Pines Mobile Home Park
Enterprise* through a pattern of racketeering activity or criminal
activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) &
1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3).
The pattern of racketeering activity or criminal activity consisted
of, but was not limited to, the acts of mail and wire fraud, 18
U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in
paragraphs 98 to 107), and extortion, 18 U.S.C. § 1951(a) and *Fla.
Stat.* § 836.05 (as described in paragraphs 108 to 111).

**7.1.4    Alternative 3: *Mark Wallach Enterprise***

119.    In the alternative to paragraphs 116-118, between 2009 and 2019
(at a minimum), Mark Wallach was an individual who constituted an "enterprise,"
within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) &
772.103(3).

a.    Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and
Mark Wallach are each a "person," within the meaning of
18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who
individually conducted, participated in, engaged in, and operated
and managed the affairs of Mark Wallach through a pattern of
racketeering activity or criminal activity within the meaning
of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§
772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering
activity or criminal activity consisted of, but was not limited
to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and

Fla. Stat. §§ 772.102(1)(b) (described in paragraphs 98 to 107),
and extortion, 18 U.S.C. § 1951(a) and Fla. Stat. § 836.05 (as
described in paragraphs 108 to 111).

**7.1.5    Alternative 4: *Kurtell Realty Enterprise***

120.    In the alternative to paragraphs 116-119, between 2009 and 2019 (at a
minimum), Kurtell Realty constituted an "enterprise," within the meaning of 18 U.S.C.
§§ 1961(4) & 1962(c) and Fla. Stat. §§ 772.102(3) & 772.103(3), in that it was a legal
entity.

a.    Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and
Mark Wallach are each a "person," within the meaning of
18 U.S.C. §§ 1961(3) & 1962(c) and Fla. Stat. § 772.103, who
individually conducted, participated in, engaged in, and operated
and managed the affairs of the Kurtell Realty through a pattern
of racketeering activity or criminal activity within the meaning
of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and Fla. Stat. §§
772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering
activity or criminal activity consisted of, but was not limited
to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and
Fla. Stat. §§ 772.102(1)(b) (described in paragraphs 98 to 107),
and extortion, 18 U.S.C. § 1951(a) and Fla. Stat. § 836.05 (as
described in paragraphs 108 to 111).

121.     At all relevant times, the enterprises alleged in paragraphs 116 through 120 (*supra*) were engaged in, and their activities affected, interstate commerce and foreign commerce.

122.     All of the acts of racketeering/crime described in paragraphs 98 to 111 were related so as to establish a pattern of racketeering activity or criminal activity, within the meaning of 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3), in that their common purpose was to defraud Plaintiffs of money and property; Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach, personally or through their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs were the victims of the acts of racketeering/crime; and/or the acts of racketeering/crime were otherwise interrelated by distinguishing characteristics and were not isolated events.

123.     All of the acts of racketeering described in paragraphs 98 to 111  were continuous so as to form a pattern of racketeering activity in that Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach engaged in the acts of racketeering/ crime over a substantial period of time (i.e., from 2009 through 2019) and in that the acts of racketeering/crime have become the regular way in which Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach do business and, thus, threaten to continue indefinitely.

124.     As a direct and proximate result of, and by reason of, the activities of Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach, and their conduct in violation of 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c) and *Fla. Stat.* § 772.104(1). Among other things, Plaintiffs suffered damages to the extent their business or property was transferred to Kurt Wallach, Wattles, Muschaweck,

Marilyn Wallach, and Mark Wallach; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach; and to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with costs, reasonable attorneys' fees and reasonable experts' fees.

**7.2** **Count Two – RICO; Racketeer Influenced and Corrupt Organizations Act**
Violation of 18 U.S.C. § 1962(c) – *Fla. Stat.* § 772.103(3) by Defendants
Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings,
Kurtell Sales, Kurtell Realty, and Kurmar Capital

125.    Plaintiffs reallege and restate paragraphs 1 through 111.

**7.2.1** *Corporate Enterprise*

126.    Kurtell Growth Industries, Kurtell Management, Sunny Lakes Capital, Kurtell Holdings, Kurtell Sales, Kurtell Realty, and Kurmar Capital constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that they were "a group of individuals associated in fact" (hereinafter referred to as the "*Corporate Enterprise*").

a.    Kurtell Growth Industries, Kurtell Management, Sunny Lakes Capital, Kurtell Holdings, Kurtell Sales, Kurtell Realty, and Kurmar Capital shared the common purposes of developing Whispering Pines Mobile Home Park and defrauding Plaintiffs of money or property;

b.    Kurtell Growth Industries, Kurtell Management, Sunny Lakes Capital, Kurtell Holdings, Kurtell Sales, Kurtell Realty, and

Page 65

Kurmar Capital were related in that they are all controlled by Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach who owe to Plaintiffs a duty of good faith and fair dealing under § 723.021, *Fla. Stat.*

c.   The *Corporate Enterprise* possessed sufficient longevity for the members to carry out their purpose(s) in that the *Corporate Enterprise* existed from 2009 through 2019 (at a minimum).

d.   Kurtell Growth Industries, Kurtell Management, Sunny Lakes Capital, Kurtell Holdings, Kurtell Sales, Kurtell Realty, and Kurmar Capital are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the *Corporate Enterprise* through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud (as described in paragraphs 98 to 107), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 108 to 111).

### 7.2.2   Alternative 1: *Kurtell Management Enterprise*

127.   In the alternative to paragraph 126, between 2009 and 2019 (at a minimum), Kurtell Management constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

    a.    Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings, Kurtell Sales, Kurtell Realty, and Kurmar Capital are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of Kurtell Management through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 98 to 107), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 108 to 111).

### 7.2.3   Alternative 2: *Whispering Pines Mobile Home Park Enterprise*

128.    In the alternative to paragraphs 126 and 127, Kurtell Management, Kurtell Holdings, and Kurmar Capital constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that they were "a group of individuals associated in "fact" (hereinafter referred to as the "*Whispering Pines Mobile Home Park Enterprise*").

    a.    Kurtell Management, Kurtell Holdings, and Kurmar Capital shared the common purposes of defrauding Plaintiffs of money or property.

    b.    Kurtell Management, Kurtell Holdings, and Kurmar Capital were related in that they are all alter egos of Kurt Wallach,

Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach.

c.   The *Whispering Pines Mobile Home Park Enterprise* possessed sufficient longevity for the members to carry out their purpose(s) in that the *Whispering Pines Mobile Home Park Enterprise* existed from 2009 through 2019 (at a minimum).

d.   Kurtell Management, Kurtell Holdings, and Kurmar Capital are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the *Whispering Pines Mobile Home Park Enterprise* through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 98 to 107), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 108 to 111).

**7.2.4   Alternative 3: *Mark Wallach Enterprise***

129.   In the alternative to paragraphs 126-128, between 2009 and 2019, Mark Wallach was an individual who constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3).

a.   Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings, and Kurtell Sales are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* §

Page 68

772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of Mark Wallach through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b)(as described in paragraphs 98 to 107), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 108 to 111).

**7.2.5   Alternative 4: *Kurtell Realty Enterprise***

130.    In the alternative to paragraphs 126-129 between 2009 and 2019 (at a minimum), Kurtell Realty constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

      a.    Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings, and Kurtell Sales are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the Kurtell Realty through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C.

§§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 98 to 107, and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 108 to 111).

131.    At all relevant times, the enterprises alleged in paragraphs 126 through 130 (*supra*) were engaged in, and their activities affected, interstate commerce and foreign commerce.

132.    All of the acts of racketeering described in paragraphs 98 to 107 and 108 to 111 were related so as to establish a pattern of racketeering activity or criminal activity, within the meaning of 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3), in that their common purpose was to defraud Plaintiffs of money and property, their common result was to defraud Plaintiffs of money and property; Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings, and Kurtell Sales, personally or through their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

133.    All of the acts of racketeering described in paragraphs 98 to 111 were continuous so as to form a pattern of racketeering activity in that Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings, and Kurtell Sales engaged in the acts of racketeering/crime over a substantial period of time (i.e., from 2009 through 2019) and in that the acts of racketeering/crime have become the regular way in which Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings, and Kurtell Sales do business and, thus, threaten to continue indefinitely.

134.    As a direct and proximate result of, and by reason of, the activities of Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings, and Kurtell

Sales and their conduct in violation of 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c) and *Fla. Stat.* § 772.104(1). Among other things, Plaintiffs suffered damages to the extent their business or property was transferred to Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings, and Kurtell Sales; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings, and Kurtell Sales; and to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

**7.3**     **Count Three – RICO; Racketeer Influenced and Corrupt Organizations Act -** Violation of 18 U.S.C. § 1962(d) – *Fla. Stat.* § 772.103(4) by Defendants Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach

135.     Plaintiffs reallege and restate paragraphs 1 through 111.

136.     As alleged in Count One, one or more of the following individuals violated 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3): Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach. Any of these person(s) who violated 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3) are referred to as the "Violator(s)" for the remainder of this Count.

137.     Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and/or Mark Wallach conspired with the Violator(s) to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*supra***,** paragraphs 116 - 120) through a pattern of racketeering activity or criminal activity (*see* paragraphs 98 - 111) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4). In particular, Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach intended to further an endeavor of

the Violator(s) which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla*. *Stat*. § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

138. Plaintiffs were injured by Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and/or Mark Wallach's overt acts that are acts of racketeering/crime or otherwise unlawful under the RICO statute, which included (among other acts) mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla*. *Stat*. §§ 772.102(1)(b) (as described in paragraphs 98 - 107), and extortion, 18 U.S.C. § 1951(a) and *Fla*. *Stat.* § 836.05 (as described in paragraphs 108 - 111).

139. As a direct and proximate result of, and by reason of, the activities of Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and/or Mark Wallach, and their conduct in violation of 18 U.S.C. § 1962(d) and *Fla*. *Stat*. § 772.103(4), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c) and *Fla*. *Stat*. § 772.104(1). Among other things, Plaintiffs suffered damages to the extent their business or property was transferred to Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and/or Mark Wallach; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and/or Mark Wallach; and to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

**7.4** **Count Four – RICO Conspiracy; Racketeer Influenced and Corrupt Organizations Act** - Violation of 18 U.S.C. § 1962(d) – *Fla. Stat.* § 772.103(4) by Defendants  Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings, Kurtell Sales, Kurtell Realty, and Kurmar Capital.

140.    Plaintiffs reallege and restate paragraphs 1 through 111.

141.    As alleged in Count One, the following individuals violated 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3): Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach.

**7.4.1** **Sunny Lakes Capital, Kurtell Holdings, Kurtell Realty and/or Kurmar Capital conspired with Kurt Wallach, Wattles, Muschaweck, and/or Marilyn Wallach**

142.    Sunny Lakes Capital, Kurtell Holdings, Kurtell Realty and/or Kurmar Capital conspired with Kurt Wallach, Wattles, Muschaweck, and/or Marilyn Wallach to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*, 116-120) through a pattern of racketeering activity or criminal activity (*see supra*, 98-111) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4). In particular, Sunny Lakes Capital, Kurtell Holdings, Kurtell Realty and/or Kurmar Capital intended to further an endeavor of Kurt Wallach, Wattles, Muschaweck, and/or Marilyn Wallach which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

**7.4.2** **Kurtell Growth Industries and Kurmar Capital conspired with Mark Wallach, Wattles, and/or Marilyn Wallach**

143.    Kurtell Growth Industries and Kurmar Capital conspired with Mark Wallach, Wattles, and/or Marilyn Wallach to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*, 116-120) through a

pattern of racketeering activity or criminal activity (*see supra*, 98-111) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat*. § 772.103(4). In particular, Kurtell Growth Industries and Kurmar Capital intended to further an endeavor of Mark Wallach, Wattles, and/or Marilyn Wallach which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat*. § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

### 7.4.3   Kurtell Sales conspired with Kurt Wallach, Wattles, Muschaweck, and/or Mark Wallach

144.    Kurtell Sales conspired with Kurt Wallach, Wattles, Muschaweck, and/or Mark Wallach to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*, 116-120) through a pattern of racketeering activity or criminal activity (*see supra*, 98-111) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat*. § 772.103(4). In particular, Kurtell Sales intended to further an endeavor of Kurt Wallach, Wattles, Muschaweck, and/or Mark Wallach which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat*. § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

### 7.4.4   Sunny Lakes Capital and Kurtell Holdings conspired with Mark Wallach

145.    Sunny Lakes Capital and Kurtell Holdings conspired with Mark Wallach to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*, 116-120) through a pattern of racketeering activity or criminal activity (*see supra*, 98-111) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat*. § 772.103(4). In particular, Sunny Lakes Capital and Kurtell Holdings intended to further an endeavor of Mark Wallach which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat*. § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

146.    Plaintiffs were injured by Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings, Kurtell Sales, Kurtell Realty and Kurmar Capital's overt acts that are acts of racketeering/crime or otherwise unlawful under the RICO statute, which included (among other acts) acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 98 to 107, *supra*), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 108 to 111, *supra*).

147.    As a direct and proximate result of, and by reason of, the activities of Kurtell Growth Industries, Sunny Lakes Capital, Kurtell Holdings, Kurtell Sales, Kurtell Realty, and Kurmar Capital, and their conduct in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c) and *Fla. Stat.* § 772.103(3). Among other things, Plaintiffs suffered damages to the extent their business or property was transferred to Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and/or Mark Wallach; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by Kurt Wallach, Muschaweck, Marilyn Wallach, and/or Mark Wallach; and to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

**7.5**     **Count Five – Unjust Enrichment**
by Defendants Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and
Mark Wallach

148.     Plaintiffs reallege and restate paragraphs 1 through 111.

149.     Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark
Wallach, each individually, received a benefit or and enrichment from Plaintiffs.

150.     The benefit retained by Kurt Wallach, Wattles, Muschaweck, Marilyn
Wallach, and Mark Wallach has been at the expense or impoverishment of Plaintiffs.

151.     There is a relationship between the enrichment of Kurt Wallach,
Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach and the impoverishment of
Plaintiffs.

152.     It would be unjust for Kurt Wallach, Wattles, Muschaweck, Marilyn
Wallach, and Mark Wallach to retain the benefit that they received from Plaintiffs.

153.     Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark
Wallach's unjust enrichment is not justified.

154.     Plaintiffs were directly injured by reason of the unjust enrichment of
Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Mark Wallach. Plaintiffs do
not have an adequate remedy at law.

155.     As a direct and proximate result of, and by reason of, the Defendants
unjust enrichment, the Plaintiffs were injured and suffered damages in excess of
$800,000 to the extent their monies were illegally transferred to the Defendants
via payment of the higher lot rent and ad valorem pass-ons through their illegal and
fraudulent behavior; to the extent Plaintiffs incurred legal fees to set aside or reverse the
transfers of money or property that were fraudulently made by the Defendants; and to
the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only
inflicted harm upon them. Plaintiffs are, therefore, entitled to recover the damages they

sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

**7.6** **Count Six – Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
Violation of §§ 501.204, and 501.211, *Fla. Stat.* by all Defendants

156.    Plaintiffs reallege and restate paragraphs 1 through 111.

157.    The Defendants have violated §§ 501.204 and 501.211, *Fla. Stat.*, which prohibit as unlawful unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce.

158.    The Florida Legislature expressly stated that §§ 501.201, *Fla. Stat., et. seq.*, is remedial. Section 501.202, *Fla. Stat.*, reads: "The provisions of this part shall be construed liberally to promote the following policies:

***

(1)    To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices.

(2)    To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

(3)    To make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."

***

159.    In 1993 the Florida Legislature amended the definition of "Trade or commerce" in § 501.203(8), *Fla. Stat.,* to include services ("... any good or service..."), thereby overruling *Florida v. De Anza Corp.*, 416 So.2d 1173 (Fla. 5th DCA), *pet. den.*,

424 So.2d 763 (Fla. 1982). *De Anza* was also disapproved by the Florida Supreme Court in *Lanca Homeowners, Inc. v. Lantana Cascade of Palm Beach, Ltd.*, 541 So.2d 1121 (Fla. 1988), *cert den.*, 493 U.S. 964 (1989).

160.    The 1993 amendment of § 501.203(8), *Fla. Stat.,* also expansively defined "Trade or commerce" to mean "... the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of *any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated*. 'Trade or commerce' shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.  (Emphasis added)

161.    As mobile home owners and renters of the lot beneath their homes, the Plaintiffs are consumers.

162.    Section 501.203(3), *Fla. Stat.,* defined a "Violation of this part" to mean "... any violation of this act and may be based upon any of the following: ...

***

(b)    The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts;

(c)    Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices."

***

163.    The Defendants have continued to send Plaintiffs monthly bills, invoices and demands for payment of illegal higher lot rent and ad valorem pass-ons.

164.    Defendants continue to assert, enforce, and threaten their improper authority to assess and lien to coerce payment of illegal higher lot rent and ad valorem

Page 78

pass-ons through the fraudulent behavior pursuant to the provisions of the lot rental agreement in violation of §§ 723.021, 501.204, and 501.211, *Fla. Stat.*

165.    Defendants conspire, participate, joined together or act in concert to violate §§ 501.204, 501.211, 723.021, and 723.059, *Fla. Stat.*, to benefit themselves, each other, and Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, and Kurtell Management.

166.    Defendants, their agents, officers, and directors each participated and were aware of the repeated and continuing violations of §§ 501.204, 501.211, 723.021, and 723.059, *Fla. Stat.*

167.    Defendants' acts caused or were likely to cause unjustified injury to the Plaintiffs - namely, injury that is substantial, not outweighed by countervailing benefits to the Plaintiffs or competition that the act or practice produces, and an injury that the Plaintiffs could not reasonably have avoided.

168.    In the alternative to the preceding paragraph, Defendants' acts offend public policy and are immoral, unethical, oppressive, unscrupulous or substantially injurious to the Plaintiffs.

169.    As a direct and proximate result of, and by reason of, the activities of the Defendants in violation of *Fla. Stat.* §§ 501.204, and 501.211, Plaintiffs were injured and suffered actual damages in excess of $800,000 to the extent their monies were illegally transferred to the Defendants via payment of the illegal lot rental increases; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by the Defendants; and to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover the actual damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

170.     Plaintiffs have been aggrieved by the Defendants' violation of *Fla. Stat.* §§ 501.204, 501.211, 723.021, and 723.059, *Fla. Stat.*

171.     Plaintiffs also seek declaratory judgment under § 501.211(1), *Fla. Stat.* Section 501.211(1), *Fla. Stat.*, reads that: "… anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."

172.     As a result, the Plaintiffs are in doubt as to their legal rights under the law. There exists a present, actual need for declaratory relief concerning these bona fide disputes.

### 7.7     Count Seven – Denial of Rights of Access under Americans with Disabilities Act ("ADA")
Violations of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 *et seq.*) and related Florida statutes by all Defendants

173.     Plaintiffs reallege and restate paragraphs 1 through 70.

174.     The Plaintiffs are "elderly persons" as defined by Section 825.101( 4), *Fla. Stat.*, as persons " … 60 years of age or older who is suffering from the infirmities of aging as manifested by advanced age or organic brain damage, or other physical, mental, or emotional dysfunctioning, to the extent that the ability of the person to provide adequately for the person's own care or protection is impaired." The Plaintiffs have mobility, balance, gait, vision, and hearing difficulties. When traveling about in public, many Plaintiffs require the use of either walking canes or sticks, walkers, wheelchairs, audiovisual devices, and hearing aids. Consequently, many Plaintiffs are "physically disabled," as defined by all applicable Florida and United States laws, and a member of the public whose rights are protected by these laws.

175.     Plaintiffs suffer from low vision and age-related cognitive decline as a

"qualified disability" under the ADA as defined in 42 U.S.C. §12012 (1)(A) and in 42 U.S.C. 3602, §802(h). They are substantially limited in performing one or more major life activities, including but not limited to accurately visualizing their world, adequately traversing obstacles and walking without assistance.

176.    The common areas and facilities of the Park is a public accommodation, open to the public, which is intended for nonresidential use and whose operation affects commerce.

177.    The Plaintiffs live in the Whispering Pines Mobile Home Park visit the Park facilities on a regular basis. Plaintiffs regularly encounter barriers (both physical and intangible) that interfered with - if not outright denied - their ability to use and enjoy the goods, services, privileges and accommodations offered at the Park. Plaintiffs personally encountered the following barriers at the Facility:

  a)    The only ramp located at the right side of the Clubhouse parking area is improperly configured and contains no guide curbs;

  b)    On numerous occasions during their visits to the Clubhouse, Plaintiffs experienced problems when transferring onto their wheelchair from their vehicle because of the configuration and side-slope of the designated parking space and access aisle located next to it;

  c)    During many visits to the rental office located on or inset to the exterior of the Clubhouse, Plaintiffs have attempted but been unable to enter the office because the door of the office is too narrow for a wheelchair;

  d)    Plaintiffs have been unable to enter the rental office by using an alternative entrance. Plaintiffs have been unable to place their

rental payment into the box located outside of the office and have had to return to place their payment in the box;

e)      The public restrooms located inside the Clubhouse lack necessary wheelchair clearances to use the sink. Plaintiffs experienced difficulty on many occasions while trying to use the restroom in the four years preceding this action;

f)      The pool does not have a lift.

178.   Plaintiffs were, and continue to be deterred from visiting the Clubhouse because they know that the Clubhouse's goods, services, facilities, privileges, advantages, and accommodations deny full and equal access to Plaintiffs due to their physical disabilities. Plaintiffs have learned that the following additional barriers to their full and equal access exist at the Facility, each of which relates to his disabilities:

**7.7.1   Site Entrance Signage**

a)      Site informational signage was not provided directing to the accessible entrance and route of travel.

b)      Tow-away warning signage was not provided visible from the street entrance or accessible parking space.

**7.7.2   Accessible Parking**

c)      Van accessible signage was not provided for the van accessible parking space.

d)      Accessible parking access aisles was not outlined in blue.

e)      Accessible parking signage mounted on the pole is not 80" minimum above the surface.

### 7.7.3   Exterior Accessible Routes

f)   A minimum of one accessible route was not provided from the public way to the accessible entrance. The main social room is only accessible via a steep (graded in excess of 15%) walkway to the front entrance.

g)   Sidewalk has raised lips that exceed 1/4" in height.

h)   Wooden ramp at the end of the access aisle does not have edge protection on both sides of the ramp and exceeds 8.33%.

### 7.7.4   Accessible Doors

i)   Entrance door thresholds exceed 1/2" in height.

j)   Entrance door landings exceed 2% slope.

k)   Entrance doors do not have the required smooth kick plate 10" high on the bottom of the doors.

### 7.7.5   Restrooms

m)   Side grab bars are not 48" long and extending a minimum of 24" in front of the toilet.

n)   Rear grab bar was not properly located on the wide side of the toilet.

o)   Soap dispenser was not located to be 40" maximum above floor to operable parts.

p)   Toilet paper dispenser was not located to be 7"- 9" in front of toilet.

q)   Plumbing and sharp objects under sink were not properly protected.

r)   Toilet was not offset to be 16"-18" from side wall.

s)      Proper floor clear area was not provided in front of the toilet for transfer space.

### 7.7.6   General

t)      Defendants do not have policies, practice and procedures in place to ensure that the Park is maintained in a condition so as to provide full and equal access to persons in wheelchairs.

u)      There are no fire alarms, strobes, horns or sprinkler system in the main social events or large congregational room.

179.    Plaintiffs live at the Whispering Pines Mobile Home Park and must have ongoing access to the Clubhouse.

180.    Defendants knew or should have known that these elements and areas of the Clubhouse were inaccessible, violate state and federal law, and interfere with or deny access to the physically disabled. Moreover, Defendants have the financial resources to remove these barriers from the Park without much difficulty or expense, and make the Park accessible to the physically disabled. To date, however, Defendants refuse to either remove those barriers or seek an unreasonable hardship exemption to excuse non-compliance.

181.    At all relevant times, Defendants have possessed and enjoyed sufficient control and authority to modify the Park to remove impediments to wheelchair access and to comply with the 2010 Standards for Accessible Design. Defendants have not removed such impediments and have not modified the Park to conform to accessibility standards. Defendants have intentionally maintained the Park in its current condition and have intentionally refrained from altering the Park so that it complies with the accessibility standards.

182.    Title III of the ADA holds as a "general rule" that no individual shall be

Page 84

discriminated against on the basis of disability in the full and equal enjoyment (or use) of goods, services, facilities, privileges, and accommodations offered by any person who owns, operates, or leases a place of public accommodation. 42 U.S.C. § 12182(a).

183.    Defendants discriminated against Plaintiffs by denying them "full and equal enjoyment" and use of the goods, services, facilities, privileges and accommodations of the Clubhouse during each visit and each incident of deterrence.

### 7.7.8    Failure to Remove Architectural Barriers in an Existing Facility

184.    The ADA specifically prohibits failing to remove architectural barriers, which are structural in nature, in existing facilities where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv).

185.    When an entity can demonstrate that removal of a barrier is not readily achievable, a failure to make goods, services, facilities, or accommodations available through alternative methods is also specifically prohibited if these methods are readily achievable. *Id.* § 12182(b)(2)(A)(v).

186.    Here, Plaintiffs allege that Defendants can easily remove the architectural barriers at the Park without much difficulty or expense, and that Defendants violated the ADA by failing to remove those barriers, when it was readily achievable to do so.

187.    In the alternative, if it was not "readily achievable" for Defendants to remove the Park's barriers, then Defendants violated the ADA by failing to make the required services available through alternative methods, which are readily achievable.

### 7.7.8    Failure to Make an Altered Facility Accessible

188.    On information and belief, Defendants have made substantial alterations to the Clubhouse since 2009 and have failed to make the altered Clubhouse accessible.

### 7.7.9   Failure to Modify Existing Policies and Procedures

189.    Defendants have failed to modify their existing policies and procedures to address accessibility and ADA compliance.

190.    Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. Plaintiffs are entitled to have reasonable attorneys' fees, costs and expenses paid by Defendants.

WHEREFORE, Plaintiffs demand judgment against Defendants and request injunctive and declaratory relief.

### 7.8   Count Eight – Florida Mobile Home Act - Breach of statutory duties and lot rental agreement
Violation of Sections 723.022, 723.017, 723.021, 723.037, 723.068, 723.033(1)(f), 723.025, and 723.061(1)(c), *Fla. Stat.,* by all Defendants

195.    Plaintiffs reallege and restate paragraphs 1 through 111.

### 7.8.1   Defendants failed to comply with requirements of applicable building, housing, and health codes

196.    Section 723.022(1), *Fla. Stat.*, mandates that a "... mobile home park owner shall at all times ... [c]omply with the requirements of applicable building, housing, and health codes."

197.    Defendants have a continuing duty to comply with building, housing and health codes under § 723.022(1), *Fla. Stat.* Section 723.022(1) creates a statutory warranty of habitability. *Grant v. Thornton*, 749 So.2d 529 (Fla. 2nd DCA 1999) (in *dicta*, the *Grant* court noted that § 83.51, *Fla. Stat.*, requirement that a landlord comply with "... applicable building, housing, and health codes ..." had been said to "... create a statutory warranty of habitability."); *see also, Lifter, Inc. v. Varnado*, 480 So. 2d 1336 (Fla. 3d DCA 1985), *rev. dismissed*, 484 So. 2d 7 (Fla. 1986); *Mansur v. Eubanks*, 401 So. 2d 1328 (Fla. 1981); *See also Renken v. Ludwig*, 2002 Wash. App. LEXIS 322 (February

21, 2002). *See also Thomas v. Goudreault,* 163 Ariz. 159, 786 P.2d 1010 (Ariz. Ct. App. 1989).

198.    The Defendants have unreasonably failed to comply with the requirements of the applicable building, housing, and health codes by permitting extensive stormwater flooding of the lots and common areas in the Park.

199.    Section 723.022 imposes a continuing duty upon Defendants to provide a lot stable enough to support a mobile home.

200.    Under § 15C-1.0102(3), *Florida Administrative Code*, Defendants have a continuing duty to grade the area beneath and around the Plaintiffs' mobile home and slope the grading so that water will not accumulate under the home. The pier foundation must be placed on "... stable soil or compacted fill."

201.    The *Florida Administrative Code* also requires landlords to ensure that sites rented for the purpose of installing mobile homes are strong enough to bear the load. Section 15C-1.0102(3) required all park owners to ensure compaction and load-bearing ability sufficient to meet the support requirements of the *Florida Building code*.

202.    Under § 64E-15.002(1)(a), *Florida Administrative Code*, Defendants have a continuing duty to grade the park spaces so that water drainage will not cause standing water under the unit.

203.    The Park continues to experience periodic flooding as a result of improper drainage. Excessive water collects in the common areas, on the mobile home lot, and under, around, and between the Homeowners' homes. Improper grading and fill prevents proper drainage of the storm water from under or around the Homeowners' homes. The Defendants have allowed storm water to pool between homes. The Defendants have allowed ankle deep storm water to pool in the driveways and walkways leading to mobile homes.

204.    The Homeowners' homes and personal belongings are damaged by excessive moisture and mold or mildew growth. Air conditioner compressors and ductwork are damaged by excessive water pooling under, between and around homes. The concrete slab base for the air conditioners sink and cease to be level. Exterior air conditioner ducts are installed improperly along the ground allows moisture to enter the duct and accumulate as mold or mildew.

205.    The Plaintiffs and Homeowners have reported to the Defendants numerous instances of:

(a)    pooling of water under, around, and between the mobile homes;

(b)    water and mold or mildew damage to the mobile homes and personal property;

(c)    pooling of water in driveways and walkways leading to mobile homes;

(d)    pooling has caused structural damage to tie-downs and anchoring systems of homes. The structural integrity of many homes has been severely compromised. Numerous homes have settling which causes damage to the home, ill-fitting doors, cabinets, windows, and frames and a severe reduction in resale value;

206.    The Defendants have breached their duty to the Homeowners by refusing to correct these flooding and drainage problems.

207.    The Defendants have breached their duty to permit the Homeowners to peacefully and quietly enjoy the possession of the premises.

208.    The Defendants breached their statutory warranty of habitability and duty by failing to properly construct and maintain the Park's storm water management system located in violation of building, housing and health codes. The defective and dangerous conditions of the premises constituted a nuisance within the meaning of § 823.01, *Fla. Stat.*, in that they deprived Homeowners of the safe, healthy, and

comfortable use of the premises and disturbed the Homeowners' peaceful and quiet enjoyment of their lot and the Park.

### 7.8.2    Defendants failed to maintain utility connections and systems for which the Park Owner is responsible in proper operating condition

209.    The Defendants failed to maintain utility connections and systems for which the Park Owner is responsible in proper operating condition.

210.    Section 723.022(4), *Fla. Stat.*, mandates that a "... mobile home park owner shall at all times ... [m]aintain utility connections and systems for which the park owner is responsible in proper operating condition."

211.    Defendants have a continuing duty to maintain the sewer and stormwater drainage system in the Park and its attendant utility connections and systems in proper operating condition under § 723.022(4), *Fla. Stat.*

212.    The Defendants have unreasonably failed to maintain the sewer and stormwater drainage system in the Park and its attendant utility connections and systems in proper operating condition as evidenced by the extensive and repeated flooding of the lots and the Park common areas.

### 7.8.3    Defendants failed to maintain the common areas in a good state of appearance, safety, and cleanliness

213.    The Defendants failed to maintain the common areas in a good state of appearance, safety, and cleanliness.

214.    Section 723.022(2), *Fla. Stat.*, mandates that a "... mobile home park owner shall at all times ... [m]aintain the common areas in a good state of appearance, safety, and cleanliness."

215.    Defendants have a continuing duty to maintain the common areas in a good state of appearance, safety, and cleanliness under § 723.022(2), *Fla. Stat.*

216.    The Defendants have unreasonably failed to maintain the common areas in a good state of appearance, safety, and cleanliness as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the extensive and repeated flooding of the lots and the Park common areas.

### 7.8.4    Defendants failed to maintain buildings and improvements in common areas in a good state of repair and maintenance

217.    The Defendants failed to maintain buildings and improvements in common areas in a good state of repair and maintenance.

218.    Section 723.022(2), *Fla. Stat.*, mandates that a "... mobile home park owner shall at all times ... [m]aintain buildings and improvements in common areas in a good state of repair and maintenance...."

219.    Defendants have a continuing duty to maintain the  buildings and improvements in common areas in a good state of repair and maintenance under § 723.022(2), *Fla. Stat.*

220.    The Defendants have unreasonably failed to maintain the buildings and improvements in common areas in a good state of repair and maintenance as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the extensive and repeated flooding of the lots and the Park common areas.

### 7.8.5    Defendants failed to provide access to the common areas at all reasonable times for the benefit of the Park residents and their guests

221.    The Defendants failed to provide access to the common areas at all reasonable times for the benefit of the Park residents and their guests.

222.    Section 723.022(3), *Fla. Stat.*, mandates that a "... mobile home park owner shall at all times ... [p]rovide access to the common areas, including buildings and improvements thereto, at all reasonable times for the benefit of the park residents

and their guests."

223.    Defendants have a continuing duty to provide access to the common areas, including buildings and improvements thereto, at all reasonable times for the benefit of the park residents and their guests under § 723.022(3), *Fla. Stat*.

224.    The Defendants have unreasonably failed to provide access to the common areas, including buildings and improvements thereto, at all reasonable times for the benefit of the park residents and their guests as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the extensive and repeated flooding of the lots and the Park common areas, which interferes with the ingress and egress of the Homeowners and their guests to the lots and the common areas.

### 7.8.6    Defendants failed to comply with properly promulgated Park rules and regulations

225.    The Defendants failed to comply with properly promulgated Park rules and regulations.

226.    Section 723.022(5), *Fla. Stat*., mandates that a "... mobile home park owner shall at all times ... comply with properly promulgated park rules and regulations." Section 723.022(5), *Fla. Stat*., further mandates that a "... mobile home park owner shall at all times ... require other persons to ... comply therewith ...."

227.    Defendants have a continuing duty to comply with properly promulgated park rules and regulations under § 723.022(5), *Fla. Stat*.

228.    The Defendants have failed to comply with properly promulgated park rules and regulations as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the refusal to recognize the Adult Only" Retirement Community or 55 and older status of the Park.

### 7.8.7    Defendants unreasonably disturb or breach the peace of the Park residents

229.    The Defendants unreasonably disturb or breach the peace of the Park residents.

230.    Section 723.022(5), *Fla. Stat.*, mandates that a "... mobile home park owner shall at all times ... not unreasonably disturb the park residents or constitute a breach of the peace." Section 723.022(5), *Fla. Stat.*, further mandates that a "... mobile home park owner shall at all times ... require other persons to ... not unreasonably disturb the park residents or constitute a breach of the peace."

231.    Defendants have a continuing duty to not unreasonably disturb the park residents or constitute a breach of the peace under § 723.022(5), *Fla. Stat.*

232.    The Defendants have unreasonably disturbed the park residents or constitute a breach of the peace as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the extensive and repeated flooding of the lots and the Park common areas, which interferes with the ingress and egress of the Homeowners and their guests to the lots and the common areas.

### 7.8.8    Defendants failed to comply with their statutory obligations of good faith and fair dealings

233.    Section 723.021, *Fla. Stat.*, mandates that "[e]very rental agreement or duty within this chapter imposes an obligation of good faith and fair dealings in its performance ...."

234.    The Defendants' have not complied with their statutory obligations of good faith and fair dealings in violation of § 723.021, *Fla. Stat.*

235.    The Defendants have breached their statutory and contractual duties and as a direct and proximate result have caused the Plaintiffs to suffer substantial and

actual damages.

236.    Pursuant to §§ 723.025 and 723.061(1)(c), *Fla. Stat.*, the Defendants must ensure the quiet and peaceful enjoyment of Plaintiffs' mobile home lots.

237.    The Defendants have breached their duty to permit the Plaintiffs to peacefully and quietly enjoy the possession of their lot and the Park.

238.    The Defendants breached their statutory warranty of habitability and duty in that they deprived Plaintiffs of the safe, healthy, and comfortable use of the premises and disturbed the Plaintiffs' peaceful and quiet enjoyment of their lots and the Park.

239.    The Defendants have breached the lot rental agreement with the Plaintiffs, accompanying statutory warranty of habitability, and the express and implied covenant of peaceful and quiet enjoyment of their lots and the Park and as a direct and proximate result have caused the Plaintiffs to suffer substantial damages.

240.    Defendants have continually and repeatedly failed to comply with the requirements of the applicable building, housing, and health codes. Absent action by this Court, Plaintiffs will suffer further or future irreparable harm.

241.    Defendants have continually and repeatedly failed to maintain utility connections and systems for which the park owner is responsible in proper operating condition. Absent action by this Court, Plaintiffs will suffer further or future irreparable harm.

242.    Plaintiffs have no adequate remedy at law to stop the further or future noncompliance with the requirements of the applicable building, housing, and health codes.

243.    Plaintiffs have no adequate remedy at law to stop the further or future failure to maintain utility connections and systems for which the park owner is

responsible in proper operating condition.

244.    Plaintiffs have a clear legal right to prohibitory and mandatory injunctive relief.

245.    Permanent injunctive relief will serve the public interest.

246.    Defendants never provided a written ninety (90) day notice to the Plaintiffs that their services were going to be eliminated or reduced as required by § 723.037(1), *Fla. Stat.*

247.    Defendants failed to provide an advance 90 day written notice to the Plaintiffs of the reduction or elimination of services and/or failure to maintain the common areas, improvements or buildings within the common areas in violation of § 723.037, *Fla. Stat.*

248.    Defendants have failed to comply with the terms and conditions in their lot rental agreements by improperly and unlawfully failing to provide a corresponding decrease in lot rental amount consistent with the reduction or elimination of services.

249.    Defendants have therefore breached their agreements with the Plaintiffs and caused them to suffer substantial losses and damages.

**7.9     Count Nine – National Origin and Race Discrimination in Violation of the Fair Housing Act**
Violation of 42 U.S.C. §§ 3601 *et seq.* by all Defendants

250.    Plaintiffs reallege and restate paragraphs 1 through 111.

251.    Defendants' policies and practices have a disproportionate adverse impact on Latinos and African Americans as compared to similarly situated whites. This disproportionate impact is the direct result of Defendants' tenant screening product that automatically and without an individualized assessment determines and reports to a housing provider that an applicant is disqualified for rental housing based

on the existence of a criminal record. This policy is not necessary to achieve any substantial, legitimate, nondiscriminatory interest. There are at least two alternatives that would have a less discriminatory effect: conducting an individualized assessment or solicit sufficient information to allow their background screening company to do so.

252.    Defendants' policies and practices have the intention to discriminate based on national origin and race. Defendants are aware of the overwhelming disparate impact of automatic disqualification of applicants with criminal records and of the less discriminatory alternatives, yet it continues to unjustifiably deny housing to Latinos and African Americans.

253.    Defendants also intentionally encourages, facilitates, and assists in the unlawful discrimination in violation of the Fair Housing Act by screening prospective homeowners with criminal records that prevents them from conducting an individualized assessment of relevant mitigating information, and by encouraging their background screening company not to conduct an individualized assessment.

254.    Defendant's policies and practices constitute unlawful discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604, by:

    a.    making mobile home housing unavailable on the basis of race and national origin in violation of 42 U.S.C. § 3604(a); and

    b.    providing different terms and conditions and discriminating in the provision of services in connection with mobile home housing on the basis of race and national origin in violation of 42 U.S.C. § 3604(b).

255.    Plaintiffs have been injured by Defendants' discriminatory conduct and suffered damages as a result.

256.    Defendants' conduct was intentional, willful, and made in reckless disregard for the known rights of others.

### 7.10    Count Ten – Disability Discrimination in Violation of the Fair Housing Act
Violation of 42 U.S.C. §§ 3601 et seq. (on behalf of Plaintiffs Deana Swank, Joyce Berry, and Kenneth Leidinger) by all Defendants

257.    Plaintiffs reallege and restate paragraphs 1 through 53, 65 through 111.

258.    Defendants' policy and practice of refusing to allow caregivers to receive the consumer file of their patients; requiring or preferring that third parties, including caregivers, submit a "power of attorney" executed by the consumer in order to request and receive the consumer file; and requiring that caregivers provide more onerous documentation of their authority than a person holding a power of attorney discriminates in the provision of services or facilities in connection with a dwelling because of handicap in violation of the Fair Housing Act, 42 U.S.C. § 3604(f).

259.    Defendants' policy and practice prevents individuals with disabilities from obtaining the information that forms the basis of Defendants' background screening reports, which they may need to challenge the accuracy of Defendants' report; challenge the appropriateness of a the Defendants' decision to deny their occupancy or tenancy or set the terms of the occupancy or tenancy based on Defendants' report; or to request as a reasonable accommodation that the Defendants deviate from its ordinary background screening policies. Defendants' policy and practice thus makes housing unavailable, denies mobile home housing, and discriminates in the terms, conditions, or privileges of sale or rental of a dwelling because of handicap in violation of the Fair Housing Act, 42 U.S.C. § 3604(f).

260.    Defendants further intentionally discriminated against Deana Swank, her elderly mother, Joyce Berry, and her elderly father, Kenneth Leidinger, on the

basis of disability by failing to provide them with equal access to their consumer file as compared to nondisabled individuals because Joyce Berry, and her spouse, Kenneth Leidinger require that their daughter, Deana Swank, serve as their caregivers.

261.    Plaintiffs Deana Swank, Joyce Berry, and Kenneth Leidinger have been injured by Defendants' discriminatory conduct and suffered damages as a result.

262.    Defendants' conduct was intentional, willful, and made in reckless disregard for the known rights of others.

**7.11    Count Eleven – Disability Discrimination in Violation of the Fair Housing Act**
Violation of 42 U.S.C. §§ 3601 et seq. (on behalf of Plaintiffs Deana Swank, Joyce Berry, and Kenneth Leidinger) by all Defendants

263.    Plaintiffs reallege and restate paragraphs 1 through 53, 65 through 111.

264.    Defendants unlawfully discriminated against Plaintiffs Deana Swank, Joyce Berry, and Kenneth Leidinger on the basis of disability in violation of 42 U.S.C. § 3604(f)(2) and (f)(3)(B) by refusing to grant Plaintiffs Deana Swank, Joyce Berry, and Kenneth Leidinger's request that, as a reasonable accommodation of Plaintiffs Joyce Berry, and Kenneth Leidinger's disabilities, Defendants permit Plaintiff Deana Swank, in her capacity as caregiver, to request and receive Plaintiffs Joyce Berry, and Kenneth Leidinger's consumer file on their behalf.

265.    Plaintiffs Deana Swank, Joyce Berry, and Kenneth Leidinger have been injured by Defendants' discriminatory conduct and suffered damages as a result.

266.    Defendants' conduct was intentional, willful, and made in reckless disregard for the known rights of others.

**7.12    Count Twelve – Violation of the Fair Credit Reporting Act**
Violation of 15 U.S.C. § 1681g (on behalf of Plaintiffs Deana Swank, Joyce Berry, and Kenneth Leidinger) by all Defendants

267.    Plaintiffs reallege and restate paragraphs 1 through 53, 65 through 111.

268.    Plaintiffs Deana Swank, Joyce Berry, and Kenneth Leidinger requested their consumer file from Defendants.

269.    Defendants had knowledge that Plaintiffs Joyce Berry and Kenneth Leidinger were persons with disabilities, who, as a result of those disabilities, would need the help of a caregiver.

270.    Plaintiffs Deana Swank, Joyce Berry, and Kenneth Leidinger provided Defendants with proper identification, including documentation of their need for a caregiver.

271.    Defendants violated 15 U.S.C. § 1681g by failing to disclose Plaintiffs Joyce Berry and Kenneth Leidinger's consumer files.

272.    As a result of Defendants' conduct, Plaintiffs Joyce Berry and Kenneth Leidinger were unable to obtain their consumer file or learn the nature, source, or accuracy of the "disqualifying record."

273.    As a result of Defendants' conduct, Plaintiffs Deana Swank, Joyce Berry, and Kenneth Leidinger suffered actual damages including but not limited to: denial of occupancy or tenancy form their caregiver daughter; frustration of their rights under the Fair Housing Act to request a reasonable accommodation from the Defendants; less desirable housing and was not medically necessary; increased medical costs as a result of needing an alternative caregiver; threat of eviction; damage to resale value of the home; damage to personal reputation; embarrassment; humiliation; and other mental and emotional distress.

274.    Defendants' conduct, actions and inactions were willful, or in the alternative, negligent.

**7.13    Count Thirteen – Violation of the Fair Credit Reporting Act**
Violation of 15 U.S.C. § 1681h (on behalf of Deana Swank, Joyce Berry and Kenneth Leidinger) by all Defendants

275.    Plaintiffs reallege and restate paragraphs 1 through 53, 65 through 111.

276.    Defendants violated 15 U.S.C. § 1681h by failing to establish reasonable requirements for proper identification so as to enable consumers with a caregiver and/or consumers with disabilities without the legal capacity to execute a power of attorney to receive a copy of their consumer file.

277.    Defendants further violated 15 U.S.C. §§ 1681g and § 1681h by placing unreasonable preconditions on the disclosure of consumer files to consumers with a caregiver and/or consumers with disabilities without the legal capacity to execute a power of attorney.

278.    As a result of Defendants' conduct, Deana Swank, Joyce Berry, and Kenneth Leidinger were unable to obtain their consumer files or learn the nature, source, or accuracy of the "disqualifying record."

279.    As a result of Defendants' conduct, Deana Swank, Joyce Berry, and Kenneth Leidinger suffered actual damages including but not limited to: denial of occupancy or tenancy for their caregiver daughter; frustration of their rights under the Fair Housing Act to request a reasonable accommodation from the Defendants; less desirable housing and was not medically necessary; increased medical costs as a result of needing an alternative caregiver; threat of eviction; damage to resale value of the home; damage to personal reputation; embarrassment; humiliation; and other mental and emotional distress.

280.    Defendants' conduct, actions and inactions were willful, or in the alternative, negligent.

**7.14    Count Fourteen – Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
Violation of §§ 501.204, and 501.211, *Fla. Stat.* (on behalf of Deana Swank, Joyce Berry and Kenneth Leidinger) by all Defendants

281.    Plaintiffs reallege and restate paragraphs 1 through 53, 65 through 111.

282.    The actions of Defendants were done in the conduct of trade or commerce.

283.    Defendants are "persons" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

284.    Defendants have engaged in unfair and/or deceptive acts or practices within the meaning of §§ 501.204 and 501.2077, *Fla. Stat.*, including, but not limited to:

  a. Disqualifying prospective homeowners based on their criminal record without making an individualized assessment of their record;

  b. Reporting to the Park background screening company that prospective homeowners were disqualified based on their criminal record without disclosing the record itself or information sufficient for the Park background screening company to locate the record;

  c. Facilitating or encouraging the Park background screening company's failure to make an individualized assessment of the

criminal record of prospective homeowners;

d.     Failing to provide the prospective homeowners with information concerning the criminal record that was the basis of Defendants' background screening report;

e.     Failing to accept documentation of Deana Swank's status as caregiver to homeowners Joyce Berry and Kenneth Leidinger;

f.     Discriminating against prospective homeowners on the basis of their disability and/or national origin;

g.     Through its background screening, violating the Fair Housing Act and/or facilitating or encouraging the Defendants' predictable violation of the Fair Housing Act to the detriment of housing applicants with criminal records, who are disproportionately likely to be African American or Hispanic; and

h.     Maintaining policies and/or practices that frustrate the ability of conserved consumers or consumers who lack the capacity to execute a power of attorney, who are disproportionately likely to have disabilities, to access information that forms the basis of a tenant screening report.

285.    Defendants' actions have offended public policy, including the policies set forth in the Fair Housing Act, 42 U.S.C. § 3601 *et seq*.; Florida's fair housing laws, §§ 760.23 and 760.35, *et seq., Fla. Stat*.; Florida's laws prohibiting discrimination by places of public accommodation, §§760.07, and 760.08, *et seq., Fla. Stat*.; and the HUD Guidance; the Fair Credit Reporting Act and its implementing regulations, 15 U.S.C. §

1681, *et seq.*

286.    Defendants' actions were willful, immoral, unscrupulous, unethical, and oppressive, and cause substantial injury to consumers like Plaintiff homeowners. Defendants' actions and failures to act were willful, and exhibit a blatant disregard for the well-being of the Plaintiff homeowners.

287.    Defendants' actions caused the Plaintiff homeowners injury that they could not have reasonably avoided. This injury was not outweighed by any countervailing benefits to consumers that the conduct produced.

288.    As a result of Defendants' actions, Plaintiff homeowners have suffered an actual loss as that term is used in §§ 501.204, *et seq., Fla. Stat.*, including, without limitation, denial of resale, increased expenses as a result of the denial of resale, and an unnecessarily reduced resale value.

289.    As a result of Defendants' actions, Deana Swank, her mother, Joyce Berry, and her father, Kenneth Leidinger have suffered an actual loss as that term is used in §§ 501.204, *et seq., Fla. Stat.*, including, without limitation, payment of multiple application fees, increased rent and expenses as a result of the Defendants' unwarranted and illegal denial of Deana Swank's denial of approval for housing, and increased medical and travel expenses as a result of Deana Swank's denial of approval for housing or residency.

290.    The foregoing conduct of the Defendants' was calculated, deceitful, and unfair and demonstrated reckless indifference to the rights of Plaintiff homeowners, prospective homeowners, Deana Swank, Joyce Berry, and Kenneth Leidinger. Accordingly, the Plaintiffs are entitled to actual damages under §§ 501.2075, 501.2077, and 501.211, *Fla. Stat.*, and declaratory and injunctive relief under § 501.211(1), *Fla.*

*Stat.*

291.     As a result of its violation of FDUTPA, Defendants are liable to Plaintiff homeowners, prospective homeowners, Deana Swank, Joyce Berry, and Kenneth Leidinger for costs and attorney's fees pursuant to § 501.2105, *Fla. Stat.*

**7.15     Count Fifteen – Malicious Prosecution**
(on behalf of Plaintiff Roy Anderson) by Defendants Kurt Wallach, Wattles, Marilyn Wallach, Mark Wallach, Muschaweck, Kurtell Growth Industries, Ltd., and Kurmar Capital.

292.     Plaintiff Roy Anderson ("Anderson") realleges and restates paragraphs 1 through 53, and 65 through 111.

293.     Defendants Kurt Wallach, Wattles, Marilyn Wallach, Mark Wallach, Muschaweck, Kurtell Growth Industries, Ltd., and Kurmar Capital commenced and continued an original civil judicial proceeding against Plaintiff Anderson.

294.     The Defendants were the legal cause of the original eviction proceeding against Plaintiff Anderson.

295.     The bona fide termination of the original eviction proceeding was in favor of Plaintiff Anderson.

296.     There was an absence of probable cause in the original eviction proceeding.

297.     The Defendants acted with malice and bad faith.

298.     The Defendants' actions caused injury to Plaintiff Anderson who suffered damages in the form of attorneys' fees totaling $1,700.00, a substantial reduction in the resale value of his home, and the attendant public humiliation.

**7.16    Count Sixteen – Abuse of Process**
(on behalf of Plaintiff Anderson) by Defendants Kurt Wallach, Wattles, Marilyn Wallach, Mark Wallach, Muschaweck, Kurtell Growth Industries, Ltd., and Kurmar Capital.

299.    Plaintiff Anderson realleges and restates paragraphs 1 through 53, and 65 through 111.

300.    Defendants Kurt Wallach, Wattles, Marilyn Wallach, Mark Wallach, Muschaweck, Kurtell Growth Industries, Ltd., and Kurmar Capital willfully or intentionally made illegal, improper, or perverted use of process against Plaintiff Anderson.

301.    The Defendants had ulterior motive or purpose in exercising the process.

302.    The Defendants misused the process after it was issued by pursuing the improper claim.

303.    The Defendants' actions caused injury to Plaintiff Anderson who suffered damages in the form of attorneys' fees totaling $1,700.00, a substantial reduction in the resale value of his home, and the attendant public humiliation.

**7.17    Count Seventeen – Civil Conspiracy**
(on behalf of Plaintiff Anderson) by Defendants Kurt Wallach, Wattles, Marilyn Wallach, Mark Wallach, Muschaweck, Kurtell Growth Industries, Ltd., and Kurmar Capital.

304.    Plaintiff Anderson realleges and restates paragraphs 1 through 53, and 65 through 111.

305.    Defendants Kurt Wallach, Wattles, Marilyn Wallach, Mark Wallach, Muschaweck, Kurtell Growth Industries, Ltd., and Kurmar Capital conspired between themselves to commence and  continue an original civil judicial proceeding against Plaintiff Anderson.

306.   The Defendants unlawfully acted to evict Plaintiff Anderson or did a lawful act by unlawfully and knowingly suborning perjurious affidavits in support of the eviction action against Anderson.

307.   The Defendants executed overt acts in pursuance of the conspiracy by initiating the eviction action and pursuing the improper claim.

308.   The Defendants' actions caused injury to Plaintiff Anderson who suffered damages as a result of the acts performed through the conspiracy in the form of attorneys' fees totaling $1,700.00, a substantial reduction in the resale value of his home, and the attendant public humiliation.

## 8.0   Demand For Jury Trial

Plaintiffs demand a jury trial as to all issues triable by jury in this case.

## 9.0   Relief Requested

Wherefore, as to all counts, Plaintiffs request that:

### 9.1   Damages and prejudgment interest

a.   Judgment be entered in favor of Plaintiffs and against Kurt Wallach, Wattles, Muschaweck, Marilyn Wallach, Mark Wallach, Kurtell Growth Industries, Kurtell Management, Kurtell Holdings, Sunny Lakes Capital, Kurtell Sales, Kurtell Realty, and Kurmar Capital jointly and severally, in the amount of Plaintiffs' damages to be proven at trial;

b.   Plaintiffs be awarded treble damages to the extent permitted by 18 U.S.C. § 1964(c) and Section 772.104, *Fla. Stat.*;

c.   Plaintiffs be awarded punitive damages to the extent permitted by Section 768.72, *Fla. Stat.*;

d.   Plaintiffs be awarded damages for violations of the Florida Deceptive

and  Unfair Trade Practices Act, pursuant to §§ 501.2075, 501.2077, and 501.211, *Fla. Stat.*;

      e.      Plaintiffs be awarded damages from Defendants to Plaintiffs pursuant to § 723.017, *Fla. Stat.*;

      f.      Plaintiffs be awarded prejudgment interest on the amount of damages and/or losses that Plaintiffs have sustained;

      g.      Plaintiffs Deana Swank, Joyce Berry, and Kenneth Leidinger be awarded actual damages and/or statutory damages and punitive damages to for violation of the Fair Credit Reporting Act pursuant to 15 U.S.C. § 1681n and § 1681o;

      h.      Plaintiff Roy Anderson be awarded damages in the form of attorneys' fees totaling $1,700.00 and for a substantial reduction in the resale value of his home;

      i.      Awarding all available damages to Plaintiffs including compensatory damages for economic losses, emotional distress, violation of their rights, and loss of housing opportunity;

**9.2      Escrow lot rental amount**

      j.      Plaintiffs be permitted, pursuant to Rule 67(a), *Fed. R. Civ. P.*, to deposit with the Court all or part of the ongoing lot rental payments obtained through the Defendants' unlawful and fraudulent behavior;

**9.3      Declaratory judgment**

      k.      Plaintiffs be awarded a judgment declaring that the Defendants violated §§ 501.204, 501.211, and Chapter 723, *Fla. Stat.*

      l.      Plaintiffs be awarded a judgment declaring that the Defendants' actions violate the Fair Housing Act;

**9.4      Refund and reduction of lot rental amount**

      m.      Plaintiffs be awarded, pursuant to § 723.033(1), *Fla. Stat.*, a refund of lot

rental amount for the unreasonableness of lot rental increases, in light of the elimination or reduction of services, failure to maintain the sewer and storm water drainage system, violations of §723.022, *Fla. Stat.*, and breach of the lot rental agreement;

n.      Plaintiffs be awarded, pursuant to §723.033(1), *Fla. Stat.*, a reduction in lot rental amount for the unreasonableness of the resulting lot rental increases, in light of the elimination or reduction of services, failure to maintain the sewer and storm water drainage system, violations of §723.022, *Fla. Stat.*, and breach of the lot rental agreement;

**9.5     Injunctive relief**

o.      Plaintiffs be awarded a prohibitory injunction against Defendants pursuant to §723.033(1)(f), *Fla. Stat.*, prohibiting future or further noncompliance with their obligations of good faith and fair dealings, including, but not limited to, recognition of the Park as an "Adult Only" retirement community and the attendant prohibition on children;

p.      Permanently enjoining Defendants from engaging in the conduct described herein and directing Defendants to take all affirmative steps necessary to remedy the effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future, including, but not limited to appointment of a monitor;

q.      Plaintiffs be awarded a mandatory injunction against Defendants pursuant to §723.033(1)(f), *Fla. Stat.*, requiring the Defendants to repair their past noncompliance with their obligations of good faith and fair dealings;

r.      Plaintiffs be awarded injunctive relief pursuant to Rule 65, *Fed. R. Civ. P.*;

s.      Plaintiffs be awarded injunctive relief prohibiting defendants who have

Page 107

violated, are violating, or likely to violate Chapter 501 Part II, *Fla. Stat.*;

t.    Plaintiffs be awarded a judgment eliminating or vacating any recorded lien, if any, recorded by, or for the benefit of, the Defendants;

**9.6    An Order finding noncompliance with obligations of good faith and fair dealing**

u.    That the Court enter an Order pursuant to § 723.021, *Fla. Stat.*, finding that the Defendants have not complied with their obligations of good faith and fair dealings;

**9.7    Reasonable attorneys' fees and costs**

v.    Plaintiffs be awarded reasonable costs and attorney's fees pursuant to Sections 723.021 and 723.068, *Fla. Stat.*, to prevailing Plaintiffs for having proved the Defendants' noncompliance with their obligations of good faith and fair dealings;

w.    Plaintiffs be awarded reasonable costs and attorneys' fees pursuant to 18 U.S.C. § 1964(c); and §§ 501.2105, 501.211, 723.068, *Fla. Stat.*;

x.    Plaintiff-homeowners and Plaintiffs Deana Swank, Joyce Berry, and Kenneth Leidinger be awarded reasonable attorneys' fees and costs under 42 U.S.C. § 3613(c); 15 U.S.C. § 1681n and § 1681o; and §§ 760.23, 760.35, 760.07, and 760.08, *et seq., Fla. Stat.*;

y.    Plaintiff Roy Anderson be awarded attorneys' fees and costs;

**9.8    Supplemental equitable and legal relief**

z.    Plaintiffs be awarded a judgment piercing of any limited liability veil;

aa.    Plaintiffs be awarded award such other relief 7as the Court deems appropriate and just pursuant to § 723.033(1)(f), *Fla. Stat.*

ab.     Plaintiffs be awarded such other and further equitable and legal relief as the Court deems just and necessary.

Dated: March 12, 2019.

Respectfully Submitted,

/S/ Daniel W. Perry
DANIEL W. PERRY
"Trial Counsel"
Fla. Bar No. 376671
4767 New Broad St, #1007
Orlando, FL 32814-6405
Ph: 407-894-9003
Email: dan@danielperry.com
Counsel for Plaintiffs